FILED

04/14/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0139

DA 25-0139

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2026 MT 76

JESSICA KALARCHIK, an individual,
and JANE DOE, an individual, on
behalf of themselves and all others
similarly situated,

        Plaintiffs and Appellees,

    v.

STATE OF MONTANA; GREGORY GIANFORTE,
in his official capacity as Governor of the State
of Montana; MONTANA DEPARTMENT OF PUBLIC
HEALTH AND HUMAN SERVICES; CHARLIE
BRERETON, in his official capacity as Director
of the Department of Public Health and Human
Services; MONTANA DEPARTMENT OF JUSTICE;
and AUSTIN KNUDSEN, in his official capacity as
Attorney General of the State of Montana,

        Defendants and Appellants.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADV-2024-261
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Austin Knudsen, Montana Attorney General, Michael D. Russell,
Thane Johnson, Michael Noonan, Assistant Attorneys General,
Helena, Montana

For Appellees:

Alex Rate, ACLU Montana Foundation, Inc., Missoula, Montana

Malita Picasso, Americal Civil Liberties Union Foundation, LGBTQ & HIV Project, New York, New York

Tina B. Solis, Seth A. Horvath, Nixon Peabody LLP, Chicago, Illinois

Submitted on Briefs: January 7, 2026

Decided: April 14, 2026

Filed:

_____
Clerk

2

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    The State appeals the December 16, 2024 Order of the First Judicial District Court, Lewis and Clark County, which preliminarily enjoined Senate Bill 458; Montana Administrative Rule 37.8.311(5) (2022 Rule); and a 2024 Motor Vehicle Department (MVD) policy (collectively, "State Policies"), as they relate to the amendment of birth certificates and driver's licenses.  Jessica Kalarchik and Jane Doe (Plaintiffs) filed this action on behalf of themselves and other individuals similarly situated.  The District Court found the State Policies likely violate Montana's Equal Protection clause.  The District Court concluded that Plaintiffs succeeded in establishing each of the four preliminary injunction factors and thus preliminarily enjoined the State from enforcing the State Policies as they pertain to amending birth certificates and driver's licenses.  We affirm.

¶2    We restate the following issues on appeal:

1. *Whether Plaintiffs have standing to challenge the State Policies.*

2. *Whether the District Court manifestly abused its discretion when it preliminarily enjoined the State Policies.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    The 2023 Legislature enacted SB 458 which defines "sex" as applicable to the Montana Code Annotated.  2023 Mont. Laws ch. 685, § 1.  Codified at § 1-1-201(1)(f), MCA, SB 458 provides that sex is:

the organization of the body parts and gametes for reproduction in human beings and other organisms.  In human beings, there are exactly two sexes, male and female, with two corresponding types of gametes.  The sexes are determined by the biological and genetic indication of male or female, including sex chromosomes, naturally occurring sex chromosomes, gonads, and nonambiguous internal and external genitalia present at birth, without

3

regard to an individual's psychological, behavioral, social, chosen, or subjective experience of gender.

In response to SB 458, the Department of Public Health and Human Services (DPHHS) announced that pursuant to the 2022 Rule[1] it would amend birth certificates only if the applicant's sex was misidentified through a scrivener's error, incorrect data entry, or if the person's sex was misidentified in the original birth certificate. In its notice of the rule change, DPHHS announced that it would not amend birth certificates based on "gender transition, gender identity, or change of gender." The 2022 Rule replaced a 2017 DPHHS rule that permitted people to change the sex designation on their birth certificate by submitting a proper attestation or court order. The MVD Policy does not appear to be published to the public and is described in more detail below.

¶4 On April 18, 2024, Jessica Kalarchik and Jane Doe filed a complaint with the First Judicial District Court seeking declaratory and injunctive relief from the State Policies asserting they violate the Montana Constitution's guarantees of equal protection, right to privacy, and prohibition against compelled speech. Plaintiffs also asserted that the State Policies violate the Montana Administrative Procedure Act. Plaintiffs do not seek to have the original record of the sex they were assigned at birth destroyed, only that they be able to amend the sex designation on their birth certificate and driver's license according to the

---

[1] The 2022 Rule was enacted following SB 280 becoming law. 2021 Mont. Laws ch. 280. SB 280 permitted amendments to the sex identified on a birth certificate only where the applicant provided a court order indicating that the sex of a person born in Montana had been changed by surgical procedure. On April 21, 2022, the Thirteenth Judicial District Court preliminarily enjoined SB 280 and its 2021 implementing rule and, on June 26, 2023, the district court permanently enjoined their enforcement. *See Marquez v. State*, No. DV 21-873 (Mont. Thirteenth Judicial Dist. filed July 16, 2021). During the interim, DPHHS enacted the 2022 Rule at issue here.

State's previous practice. In support of their Motion for Preliminary Injunction, the Plaintiffs provided declarations by Randi C. Ettner, Ph.D., Ayden Scheim, Ph.D.,[2] Ms. Kalarchik, and Ms. Doe.

¶5    As background information, we recite only that information in the record that is necessary for an understanding and resolution of this appeal. The information is derived from Dr. Ettner's Declaration. Dr. Ettner is a licensed clinical and forensic psychologist who has been involved in the treatment of patients with gender dysphoria since 1977. Based on her professional experience, Dr. Ettner describes gender identity as a person's inner sense of belonging to a particular sex, such as male or female, and not simply a function of the appearance of an infant's genitalia at birth. Gender dysphoria is a serious medical condition where a person's gender identity does not match their sex assigned at birth.[3] A transgender person is someone who has a gender identity that differs from their assigned sex at birth. Cisgender people have a gender identity that aligns with their sex assigned at birth. People diagnosed with gender dysphoria have an intense and persistent discomfort with their assigned sex which can make it difficult to fully participate in daily life. This is sometimes described as the grief of being born into the "wrong body." Dr. Ettner points to a growing assemblage of research findings that gender identity is innate,

---

[2] Dr. Sheim is an epidemiologist with a Ph.D. in Epidemiology and Biostatistics. Dr. Scheim's declaration focuses on the role of amended identity documents and improved mental health outcomes for people diagnosed with gender dysphoria. Dr. Sheim's declaration has limited application to the narrow issue of an appeal of a preliminary injunction and is only described here briefly.

[3] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)* 451-59 (5th ed. 2022).

based in part on the interaction of the developing brain and sex hormones, and that efforts to change a person's gender identity are harmful to a person's health and well-being. A transgender man cannot simply turn off his gender identity like a switch any more than a cisgender man can turn off his male gender identity. Dr. Ettner further opines that without proper treatment, individuals with gender dysphoria experience anxiety, depression, suicidality, and other attendant mental health issues. Medically accepted standards of care for people diagnosed with gender dysphoria include, *inter alia*, changes in gender expression (social transition), hormone therapy to reduce the discordance between the body and one's gender identity, surgery, and psychotherapy. These standards of care explicitly state that changing the gender marker on identity documents assists in alleviating gender dysphoria.[4]

¶6 Plaintiff Jessica Kalarchik is a transgender woman who was assigned male at birth and served in the United States Army for 31 years.[5] She was born and raised in Montana but now lives in Alaska. She has experienced symptoms of gender dysphoria since junior high and was diagnosed with gender dysphoria around 2022. Ms. Kalarchik lives her life as a woman and has taken several steps to bring her body and outward gender expression into line with her female gender identity, including legally changing her name to a traditionally feminine one and her name and sex designation on her Alaska nursing license,

---

[4] Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Ver. 8*, 23 (Suppl. 1) Int'l J. of Transgender Health 51, 518 (2022).

[5] At this preliminary stage in the proceeding, we find it appropriate to use the same pronouns that Plaintiffs use to describe themselves.

her Alaska driver's license, and her federal social security card. Ms. Kalarchik is typically perceived by others as female. The State Policies prevent Ms. Kalarchik from updating her sex designation on her birth certificate. Ms. Kalarchik also alleges that DPHHS refused to amend her name on her birth certificate even though she has an Alaska court order changing her legal name.

¶7 Jane Doe, who is proceeding in this matter under a pseudonym by leave of the court, is a 25-year-old transgender woman who was assigned male at birth and lives in Montana. She has experienced symptoms of gender dysphoria since middle school and was diagnosed with this condition in 2022. Upon her diagnosis in 2022, Ms. Doe began hormone therapy and living and presenting openly as a woman. After two years of transition, Ms. Doe's appearance has changed significantly and no longer matches the photo or sex designation on her Montana driver's license. In September 2023, Ms. Doe completed the paperwork and paid the required fee to change the sex designation on her birth certificate but received a letter in March 2024 from DPHHS stating that under the 2022 Rule, she could not change the sex designation on her birth certificate. In December 2023, Ms. Doe brought her updated social security card to the MVD in support of her application to amend her driver's license and was told that because of the MVD Policy she could not amend the sex designation on her driver's license without a court order and a corrected birth certificate. Ms. Doe had a prolonged interaction with law enforcement during a traffic stop because the officer could not verify her identity based on her pre-transition driver's license photo and sex designation. It took the officer a long time to stare at her driver's license photo and accept that the person pictured was in fact Ms. Doe.

7

As she continues her transition, Ms. Doe fears that not having a driver's license that accurately portrays how she holds herself out to the public will put her at risk of criminal prosecution because her driver's license will no longer be effective to verify her identity should she be required to do so.

¶8 In response to the declarations offered in support of the Plaintiffs, the State provided a declaration by Colin Wright, Ph.D., an evolutionary behavioral ecologist. Dr. Wright bases his opinions on his professional experience in ecology and biology and makes several references to how sex is determined in the animal kingdom, beyond the human species. Dr. Wright finds that in biology, the sex of an individual is determined by the type of gamete an individual has the function to produce. Because sex is based on an individual's primary reproductive organs, Dr. Wright reasons, hormonal and/or surgical treatments for gender dysphoria are merely cosmetic. Nonetheless, Dr. Wright uses the singular they/them pronouns to refer to Ms. Kalarchik and Ms. Doe throughout his declaration despite his insistence that both plaintiffs are biological males.

¶9 On December 16, 2024, the District Court issued its Order preliminarily enjoining the State from enforcing the State Policies.[6] The District Court applied the "serious questions" test, discussed below, and concluded that the Plaintiffs established each of the four prongs necessary for a preliminary injunction. Regarding Plaintiffs' likelihood of success on the merits, the District Court reasoned that cisgender and transgender Montanans are equivalent in all relevant respects other than their status as transgender or

---

[6] The District Court found that the Plaintiff's equal protection claim was dispositive and thus only the Plaintiffs' equal protection claim is on appeal.

8

cisgender except that only cisgender, and not transgender Montanans can obtain amended birth certificates and driver's licenses accurately reflecting their gender identity.  Because Article II, Section 4 prohibits state discrimination on account of a person's sex, the District Court concluded that "the right to be free from discrimination on the basis of sex is a fundamental right" and therefore applied strict scrutiny.  It then applied the reasoning in *Bostock v. Clayton County*, 590 U.S. 644, 140 S. Ct. 1731 (2020) that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  *Bostock*, 590 U.S. at 660, 140 S. Ct. at 1741.  Of note, the State ended its argument at the class identification stage without articulating any relevant state interest.  This prompted the Plaintiffs to suggest that the State's interest may be to maintain accurate vital statistics.  The District Court reasoned, however, that if the State Policies are not necessary to effectuate the State's interest, then they cannot be narrowly tailored.  Thus, the District Court found that Plaintiffs met their burden of establishing a likelihood of success on the merits.  Citing Montana and United States Supreme Court precedent that "the loss of a constitutional right constitutes irreparable harm" in the context of a preliminary injunction,[7] the District Court concluded that the Plaintiffs demonstrated the second prong of likely irreparable harm.  The District Court noted that when the government opposes a preliminary injunction, the final two prongs merge into one and that the government suffers no harm when enjoined from prima facie

---

[7] *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 15, 366 Mont. 224, 286 P.3d 1161 (*MCIA I*) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689-90 (1976)).

9

unconstitutional practices and therefore the balance of the equities and public interest weighed in favor of the Plaintiffs.

## STANDARD OF REVIEW

¶10 "Standing is a threshold question that this Court determines as a matter of law and reviews de novo." *Gazelka v. St. Peter's Hosp.*, 2015 MT 127, ¶ 10, 379 Mont. 142, 347 P.3d 1287. This Court reviews a district court's grant or denial of a preliminary injunction for a manifest abuse of discretion. *Mercer v. Mont. Dep't of Pub. Health and Hum. Servs.*, 2025 MT 9, ¶ 9, 420 Mont. 201, 562 P.3d 502. "A court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *Mercer*, ¶ 9 (quoting *Planned Parenthood of Mont. v. State*, 2022 MT 157, ¶ 5, 409 Mont. 378, 515 P.3d 301). "A manifest abuse of discretion is one that is obvious, evident, or unmistakable." *Mercer*, ¶ 9 (quoting *Stensvad v. Newman Ayers Ranch Inc.*, 2024 MT 246, ¶ 8, 418 Mont. 378, 557 P.3d 1240).

¶11 "We review a district court's interpretation of the law de novo when its decision on a preliminary injunction was based on legal conclusions." *Cross v. State*, 2024 MT 303, ¶ 12, 419 Mont. 290, 560 P.3d 637. "[I]t is well established that a court does not decide the merits of a claim in a preliminary injunction proceeding." *Mercer*, ¶ 12 (quoting *Netzer L. Off., P.C. v. State*, 2022 MT 234, ¶ 15, 410 Mont. 513, 520 P.3d 335). Accordingly, our review of a district court's order granting injunctive relief is intended to be "limited and deferential" and likewise "does not extend to the underlying merits of the case." *Mercer*, ¶ 12 (quoting *Planned Parenthood of Mont. v. State*, 2024 MT 227, ¶ 14, 418 Mont. 226, 557 P.3d 471 (*Planned Parenthood IV*); citations omitted). However, in reviewing a

preliminary injunction, we may review whether the district court applied an incorrect legal standard, while remaining mindful that a preliminary injunction does not resolve the underlying merits of the constitutional claim. *Mercer*, ¶ 12; *Planned Parenthood IV*, ¶ 21.

**DISCUSSION**

¶12    *1. Whether Plaintiffs have standing to challenge the State Policies.*

¶13    As a "threshold, jurisdictional requirement," *Cross*, ¶ 14 (quoting *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 29, 360 Mont. 207, 255 P.3d 80), courts "must evaluate standing at every stage in the litigation." *Cross*, ¶ 14 (citing *Barrett v. State*, 2024 MT 86, ¶ 18, 416 Mont. 226, 547 P.3d 630). Standing contains two primary aspects: the case-or-controversy requirement grounded in the Montana Constitution "and judicially created prudential limitations imposed for reasons of policy." *Schoof v. Nesbit*, 2014 MT 6, ¶ 15, 373 Mont. 226, 316 P.3d 831. At a minimum, the Constitution requires a plaintiff to demonstrate that she "has suffered a past, present, or threatened injury to a property or civil right." *Schoof*, ¶ 15. The plaintiff must have "[a] personal stake in the outcome of the controversy at the commencement of the litigation." *Schoof*, ¶ 15 (quoting *Heffernan*, ¶ 30). The "injury must be concrete—that is, it must be 'actual or imminent, not conjectural or hypothetical.'" *Gottlob v. Desrosier*, 2025 MT 56, ¶ 14, 421 Mont. 176, 565 P.3d 1196 (quoting *Mitchell v. Glacier Cnty.*, 2017 MT 258, ¶ 10, 389 Mont. 122, 406 P.3d 427). An alleged "violation of a constitutional or statutory right may confer standing." *Gottlob*, ¶ 15 (citing *Mitchell*, ¶ 11). And in the context of an equal protection claim, the state's "unequal treatment and unequal opportunity to obtain a benefit is an injury for standing purposes." *Gazelka*, ¶ 16; *see also Heckler v. Mathews*, 465 U.S. 728, 739-40, 104 S. Ct. 1387,

11

1395-96 (1984). Where a single plaintiff in a multi-plaintiff proceeding, such as here, establishes standing, "the standing of any one plaintiff is sufficient for a claim to proceed" and the standing of the other plaintiffs requires no additional inquiry. *Cross* ¶ 16 (quoting *Barrett*, ¶ 19).

¶14 Here, the State argues that the Plaintiffs' injuries are "far too speculative" and depend too much on independent third-party action. The State contends that the Plaintiffs have not demonstrated that they will be required to present the identification documents which they seek to amend. The State, however, overlooks the District Court's finding that Plaintiffs alleged and demonstrated concrete, particularized injuries traceable to the State Policies. Each time that Ms. Doe or Ms. Kalarchik must present their identifying documents to another person—during a traffic stop, to vote, to apply for employment, or to board a plane—they must disclose that they are transgender. They must carry and produce a government issued document that does not reflect who they believe they are. Plaintiffs, therefore, have a vested and deeply personal stake in the ultimate outcome of this litigation. Ms. Doe has shown sufficient and concrete injury in her prolonged traffic stop, which put law enforcement in the unenviable position of having to make a positive identification of someone whose outward appearance had dramatically changed due to prescribed treatments for gender dysphoria. Contrary to the State's assertion, Ms. Doe is required by state law to carry and display her license upon demand by law enforcement whenever she operates a motor vehicle. *See* § 61-5-116, MCA. It is the State's Policies that cause Plaintiffs to suffer these real and repeated injuries. At the very least, Ms. Doe

has made a sufficient showing of actual, non-hypothetical injury for this litigation to properly proceed.

¶15 Accordingly, since Plaintiffs have established standing of at least one plaintiff to sue, this case presents a justiciable case or controversy.

¶16 *2. Whether the District Court manifestly abused its discretion by preliminarily enjoining the State Policies.*

¶17 To begin, the State argues that the District Court erred by applying the "serious questions" framework. The State also argues that the District Court incorrectly relied on the Plaintiffs' declarations in support of their motion for a preliminary injunction since they were made "to the best of [Plaintiffs'] knowledge and belief" when the preliminary injunction standard requires "the material allegations of the affidavits setting forth the grounds for the order are made positively and not upon information and belief." *See* § 27-19-303(2)(b), MCA. We address each contention in turn.

¶18 The Legislature enacted HB 409 clarifying that "the court shall examine the four criteria in subsection (1) independently. The court may not use a sliding scale test, the serious question test, flexible interplay, or another federal circuit modification to the criteria." Section 27-19-201(4)(b), MCA; 2025 Mont. Laws ch. 20, § 1 (*abrogating in part Stensvad*, ¶ 29). The District Court's order is dated December 16, 2024, and House Bill 409 was enacted into law on March 25, 2025, upon the Governor's signature. The Plaintiffs contend that the District Court appropriately applied the standard that existed at the time of its Order. The State urges us to remand this case to the District Court to apply

the amended standard and argues that the change in the law is procedural, citing *City of Helena v. Cmty. of Rimini*, 2017 MT 145, 388 Mont. 1, 397 P.3d 1.

¶19 The serious questions test adopted by this Court in *Stensvad* merely set the floor for granting a preliminary injunction in Montana. *Stensvad* did not *require* district courts to apply the serious questions test in lieu of finding that each of the elements in § 27-19-201(1), MCA, were independently met. *See Stensvad*, ¶¶ 14, 26 (emphasizing the importance of flexibility in the preliminary injunction context). Instead, this Court held in *Stensvad* that the serious questions test was a sufficient means of showing that the requirements of § 27-19-201(1), MCA, were met when it is particularly difficult for applicants to prove they are likely to succeed on the merits. *Stensvad*, ¶ 27. Of course, an individual showing that each of the four elements are met, without any weighing between the elements, still satisfies the plain language of § 27-19-201(1), MCA.

¶20 Here, although the District Court acknowledged the sliding scale in its Order, it went on to find each of the four elements of the preliminary injunction test were individually met. The District Court's order made only a single reference to "serious questions"—when discussing whether the law was narrowly tailored. Because the State made no argument that the restrictions were narrowly tailored to meet a compelling interest, that reference did not affect the court's ultimate conclusion that the Plaintiffs had met each of the preliminary injunction factors, particularly that the Plaintiffs are likely to succeed on the merits. As the District Court found that all of the preliminary injunction factors were independently met, without the necessity of balancing and weighing them against each other, it is of no consequence that the court's decision referred to the serious questions test, even though

that was the applicable standard at the time of its decision. We therefore decline the State's invitation to unnecessarily delve into the question of whether the 2025 amendments to § 27-19-201(1), MCA, were procedural and may be applied retroactively; instead, we are able to address the substance of the District Court's analysis.

¶21 Regarding Plaintiffs' declarations, it is clear from their contents that Plaintiffs based their allegations on direct, personal knowledge of their experience with gender dysphoria and of Ms. Doe's interactions with MVD staff and law enforcement. *See Peterson v. Fugle*, 96 Mont. 537, 542, 31 P.2d 1030, 1032 (1934) (facts must be alleged "in positive terms" and therefore "mere expressions of opinion or belief" are insufficient). Critically, the State did not offer any evidence below to rebut the existence of the unpublished MVD Policy and continues to defend it on appeal. The District Court did not err in its reliance at this preliminary stage of the proceeding on the Plaintiffs' unrebutted declarations since they were made based on the Plaintiffs' own direct, personal knowledge. The State, of course, can freely object to the admission of the Plaintiffs' evidence at the merits trial.

¶22 We now turn to the issue at hand: whether the District Court manifestly abused its discretion by concluding that the State Policies discriminate based on sex and that Plaintiffs established all four factors in the preliminary injunction standard.

¶23 "A preliminary injunction is an extraordinary remedy never awarded as a right." *Montanans Against Irresponsible Densification, LLC v. State*, 2024 MT 200, ¶ 10, 418 Mont. 78, 555 P.3d 759 (*MAID I*) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008)). "The purpose of a preliminary injunction is to preserve the status quo and minimize harm to all parties pending full trial or resolution on the

15

merits." *Stephenson v. Lone Peak Pres., LLC*, 2025 MT 148, ¶ 14, 423 Mont. 46, 571 P.3d 1042 (citations omitted). Under Montana's preliminary injunction statute, an applicant must establish four factors: "(a) the applicant is likely to succeed on the merits, (b) the applicant is likely to suffer irreparable harm in the absence of preliminary relief, (c) the balance of equities tips in the applicant's favor, and (d) the order is in the public interest." *Mercer*, ¶ 13 (citing *MAID I*, ¶ 10; § 27-19-201(1), MCA; *Winter*, 555 U.S. at 20, 129 S. Ct. at 374). This test is conjunctive, meaning that an applicant must establish each factor. *Stephenson*, ¶ 13.

¶24 Consistent with § 27-19-201(4)(b), MCA, the District Court considered each of the four statutory factors independently. The court made express findings as to the likelihood of success on the merits, irreparable harm, balance of the equities, and public interest. The court supported its reasoning with evidence and arguments from the record as reflected in the court's written order. Our review therefore focuses on whether the District Court's legal conclusions were correct and whether it manifestly abused its discretion, i.e., whether the alleged abuse of discretion was "obvious, evident, or unmistakable." *Mercer*, ¶ 9 (citation omitted).

***Likelihood of Success on the Merits***

¶25 An applicant seeking a preliminary injunction must establish that they are "likely to succeed on the merits." Section 27-19-201(1)(a). Plaintiffs allege a constitutional injury in that they were denied equal protection of the law because transgender and cisgender Montanans are treated differently when amending their birth certificates. We therefore must begin with the text of our state Equal Protection Clause.

16

¶26    Article II, Section 4, of the Montana Constitution provides:

**Individual Dignity**.   The dignity of the human being is inviolable.   No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.

(Emphasis in original.)  The provision's federal counterpart in the Fourteenth Amendment of the United States Constitution provides only that the State may not "deny to any person the equal protection of the law."  U.S. Const. amend. XIV, § 1.  Based on the text alone, Montana's Individual Dignity provisions allow for "even more individual protection than the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution."  *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 15, 325 Mont. 148, 104 P.3d 445 (citing *Cottrill v. Cottrill Sodding Serv.*, 229 Mont. 40, 42, 744 P.2d 895, 879 (1987)); *see also A.J.B. v. Mont. Eighteenth Jud. Dist. Ct.*, *Gallatin Cnty.*, 2023 MT 7, ¶ 24, 411 Mont. 201, 523 P.3d 519.  The first "Individual Dignity" clause provides that the dignity of the human being is inviolate.  The second "Equal Protection" clause ensures that no person will be denied the equal protection of the laws.   And the third "Non-Discrimination" clause specifically identifies categories of discrimination that are prohibited.  From the text alone, Montana's Individual Dignity provisions far exceed the protections provided by the federal Equal Protection Clause.  With that obvious distinction highlighted, we conclude that Montana case law interpreting the Individual Dignity provisions directs our analysis, not federal precedent.

¶27    The District Court found that Plaintiffs must present identification documents that do not reflect their gender identity and, as a result, must disclose that they are transgender

17

each time an inquiry is made. Government issued identification documents are necessary to access public life. When they do not accurately reflect a person's sexual identity, the transgender Montanan is prevented, based on their sex, from obtaining the same attributes of public life that a cisgender Montanan may obtain. Hence, the inability of transgender Montanans to receive government-issued identification documents accurately reflecting their gender identity is fundamentally about the nature of sex and suspect class discrimination under Article II, Section 4—a clause that enshrines individual dignity, equal protection, and nondiscrimination. Transgender discrimination is, by its very nature, sex discrimination. Discrimination based on sex is expressly prohibited under Montana's unique Nondiscrimination Clause—"[n]either the state nor any person, firm, corporation, or institution shall discriminate on account of . . . sex . . . ." Thus, Article II, Section 4 is unequivocal in its intolerance for discrimination based on sex. Because sex discrimination involves a fundamental right under Article II, the appropriate level of judicial review is strict scrutiny. *Snetsinger*, ¶ 17.

¶28   Being transgender is also a suspect class under the Equal Protection Clause of Article II, Section 4,—"[n]o person shall be denied equal protection of the law." The central premise of our state's equal protection guarantee "is that persons similarly situated with respect to a legitimate governmental purpose of the law must receive like treatment." *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 28, 374 Mont. 453, 325 P.3d 1211 (quoting *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192). We apply a three-step analysis to equal protection claims based on a suspect class: we "(1) identify the classes involved and determine if they are similarly situated; (2) determine

18

the appropriate level of scrutiny to the challenged legislation; and (3) apply the appropriate level of scrutiny to the challenged statute." *Goble*, ¶ 28.

¶29 The plaintiff must identify the similarly situated classes because "[d]iscrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances." *Goble*, ¶ 29 (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995); citation omitted). "A law or policy that contains an apparently neutral classification may violate equal protection if 'in reality [it] constitut[es] a device designed to impose different burdens on different classes of persons'" *Snetsinger*, ¶ 16 (quoting *State v. Spina*, 1999 MT 113, ¶ 85, 294 Mont. 367, 982 P.2d 421). The objective of identifying the classes that are similarly situated "is to isolate the factor allegedly subject to impermissible discrimination." *Goble*, ¶ 29. "Thus, two groups are similarly situated if they are equivalent in all relevant respects other than the factor constituting the alleged discrimination." *Goble*, ¶ 29. Plaintiffs have defined the classes as transgender Montanans seeking to amend the sex designation on their birth certificates or driver's licenses and cisgender Montanans seeking to amend the sex designation on their birth certificates or driver's licenses. Under the State Policies only cisgender Montanans are eligible for birth certificates and driver's licenses which match their gender identity. Upon discovering that her sex was incorrectly listed as male on her identity documents, a cisgender woman can update her identity documents. Thus, cisgender Montanans can obtain a birth certificate that matches their gender identity. However, a transgender Montanan, such as Ms. Doe, is not allowed to have birth certificates and identity documents which match her gender identity. Thus, transgender and cisgender Montanans are treated unequally in their ability

19

to obtain amended birth certificates because the State Policies allow cisgender people to obtain amended birth certificates, including a change to the sex listed on their original birth certificate if the sex was incorrectly identified due to a scrivener's error or incorrect data entry, while a transgender Montanan is not allowed to obtain an amended identity document.

¶30  We conclude transgender and cisgender Montanans are similarly situated in their need for identification documents; here, birth certificates and driver's licenses that list the sex they identify with and believe themselves to be.  As with the Nondiscrimination Clause, the appropriate level of scrutiny for a violation of a fundamental right contained within Section 4 of Article II is strict scrutiny.[8]

¶31  Regarding the Equal Protection and Nondiscrimination Clause alleged violations, the District Court was required to determine whether there had been a sufficient showing of likelihood of success on the merits.  This required the District Court to assess whether the State made an adequate showing, pursuant to strict scrutiny review, of a compelling state interest and that the State Policies are narrowly tailored to advance that interest.  Here, the State did not develop its arguments at the District Court level as to how the State Policies advance a state interest.  However, on appeal the State maintains that the State Policies advance its "weighty" interests in ensuring accuracy of vital records, furthering health and research efforts, facilitating records-matching programs, and protecting

---

[8] The parties did not address the applicability of the Dignity Clause below and we, accordingly, will not address its applicability.  We leave it to the parties to choose whether to advance arguments regarding the applicability of the Dignity Clause to the present issue, which is further discussed in the Special Concurrence.

women's rights. The State further argues that a consistent definition of sex is necessary to operationalize several provisions of Montana law. *See* § 33-1-201, MCA (insurance regulations); § 13-38-201, MCA (political parties shall appoint a person of each sex to serve as committee representatives for each election precinct); § 2-18-208, MCA (equal pay for equal work). We take no position on whether these other statutes have compelling state interests; however, we note the statutes the State cites in support of this argument appear designed to remedy sex discrimination, not perpetuate it. Here, the District Court concluded the record did not support a finding that there were problems maintaining accurate vital statistics before the implementation of the State Policies. The Plaintiffs contend that amending a birth certificate does not destroy the original record. Thus, as the District Court put it: "[i]f the challenged state actions are not necessary to effectuate the state interest, they cannot be narrowly tailored."

¶32 The State further responds that the State Policies do not discriminate based on sex because limiting birth certificate changes to designations that were originally incorrect or misidentified does not discriminate based on sex. The State, therefore, denies that the State Policies discriminate at all because they apply equally to all sexes and both cisgender and transgender Montanans can only amend their birth certificate if there was some data entry error or other mistake in misidentifying their biological sex at birth. However, as we have explained, the State's position ignores that only transgender persons are discriminated against when they are not allowed to have identification documents that match their gender identity and that this constitutes discrimination based on sex, a category specifically identified in Montana's Nondiscrimination Clause. Our Montana Constitution requires the

21

State to treat individuals with dignity even as it exercises its broad police powers. This bold constitutional proposition protects all individuals and does so equally. Thus, although the State Policies apply to all Montanans, it applies to Plaintiffs individually and they have made an adequate preliminary showing that in the context of amended birth certificates the State Policies result in "unequal treatment and unequal opportunity to obtain a benefit" based on sex discrimination. *Gazelka*, ¶ 16.

¶33 Not so fast, the State contends, for Montana case law shows a tolerance for different treatment based on sex. Shortly after the enactment of the 1972 Constitution, *In re Est. of Kujath*, 169 Mont. 128, 545 P.2d 662 (1976), this Court declined to find a statute unconstitutional which required a husband's consent for a wife to leave him less than two-thirds of her estate. The Court reasoned that "[w]e could agree with" the constitutional argument if the statute "stood alone," but the challenged statute "impose[d] upon married women a restriction reciprocal to that placed on men in other sections of the code" and therefore the Court applied the statute to grant the widower's petition for his elective share of the estate of his late wife. *In re Est. of Kujath.*, 169 Mont. at 131-33, 545 P.2d at 664-65. We noted that the Legislature had recently enacted the Montana Probate Code which placed an "identical restriction on both married men and women as that imposed" by the challenged statute. *In re Est.of Kujath*, 169 Mont. at 133, 545 P.2d at 665. *In re Est. of Kujath* is inapposite to the State's proposition because there was no showing of disparate treatment of individuals based on a suspect classification. The statute under review there did not force Mr. Kujath to sit through an extended traffic stop and require disclosure of his closely held medical history like the State Policies have done to Ms. Doe. To the

22

contrary, the challenged statue granted a fair share of the estate to a childhood sweetheart and husband who had been written out of the will two days before the death of Ms. Kujath. *In re Est. of Kujath*, 169 Mont. at 129, 545 P.2d at 663.

¶34 The other Montana cases that the State cites to shore up its position fare no better as the issues involved statutory interpretation, not the Equal Protection Clause, and the dictum announced in those cases—that there are only two sexes—is consistent with the reasoning here that discrimination based on a person's transgender status is based on sex because it tolerates certain traits in one sex that it condemns in another sex. *See Campbell v. Garden City Plumbing & Heating, Inc.*, 2004 MT 231, 322 Mont. 434, 97 P.3d 546 (sexual harassment); *Mont. State Univ.-N. v. Bachmeier*, 2021 MT 26, 403 Mont. 136, 480 P.3d 233 (same); *see also Mountain States Tel. & Tel. Co. v. Comm'r of Lab. & Indus.*, 187 Mont. 22, 608 P.2d 1047 (1979) ("[p]regnancy is a condition unique to women, and the ability to become pregnant is a primary characteristic of the female sex"); *but see Miller-Wohl Co., Inc. v. Comm'r of Lab. & Indus.*, 214 Mont. 238, 262, 692 P.2d 1243, 1255 (1984), *vacated,* 479 U.S. 1050, 107 S. Ct. 919 (1987) (suggesting that extending the Montana Maternity Leave Act (MMLA) benefits to all workers regardless of sex "would end any argument that the MMLA is indeed sex-based discrimination in violation of Title VII").

¶35 Accordingly, the District Court did not abuse its discretion in concluding that Plaintiffs made a sufficient preliminary showing of unequal treatment under Article II, Section 4 to warrant temporary injunctive relief. At the preliminary injunction stage, the question before this Court is not whether Plaintiffs will ultimately prevail on their

23

constitutional claims, but whether the District Court manifestly abused its discretion—based on the arguments and record before it—when finding that Plaintiffs demonstrated a likelihood of success sufficient to warrant temporary relief. The District Court determined that the State Policies likely result in unequal treatment and discrimination based on sex of transgender and cisgender Montanans with respect to amended identity documents, and that this differential treatment was a sufficient showing of a constitutional injury under Article II, Section 4, of the Montana Constitution. On the limited record and arguments presented at this stage of the proceeding, and applying the deferential abuse of discretion standard, we cannot conclude that this determination was a manifest abuse of discretion.

***Likelihood of Irreparable Harm***

¶36 The second factor of the preliminary injunction standard examines whether "the applicant is likely to suffer irreparable harm in the absence of preliminary relief." Section 27-19-201(1)(b), MCA. In accordance with our consistent case law holding that in the context of a preliminary injunction the loss of a constitutional right constitutes irreparable harm, the District Court found that the Plaintiffs demonstrated a likelihood of irreparable harm if the State Policies are not enjoined. *See MAID I*, ¶ 16; *Netzer L. Off., P.C.*, ¶ 20; *Driscoll v. Stapleton*, 2020 MT 247, ¶ 15, 401 Mont. 405, 473 P.3d 386; *MCIA I*, ¶ 15.

¶37 The State argues that courts should not "collapse the four [preliminary injunction] factors into one[,]" citing *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194 (3d Cir. 2024), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025). However, the Plaintiffs have made a sufficient preliminary showing that the State Policies are being enforced against them. We also agree that a person's access

24

to public life, which requires birth certificates and driver's licenses, is a time-sensitive need without which the Plaintiffs are likely to suffer irreparable harm.

¶38    In support of its arguments, the State cites to several federal cases for the proposition that plaintiffs need more than a sufficient showing of a constitutional violation of their rights to establish likelihood of irreparable harm.  Here, Plaintiffs have adequately demonstrated that relief from enforcement of the State Policies as applied to amending birth certificates is the only avenue of relief available to the Plaintiffs.

¶39    Finally, the State appears to suggest that we limit a presumption of irreparable harm in the context of constitutional violations to First Amendment claims, citing *Del. State Sportsmen's Ass'n, Inc.*, 108 F.4th at 203.  Although it is true, as the State points out, that "not every constitutional infringement may support a finding of irreparable harm," *Weems v. State*, 2019 MT 98, ¶ 25, 395 Mont. 350, 440 P.3d 4, we see no reason why a preliminary showing of an equal protection violation on the claims raised here is not equivalent in its risk of irreparable harm as a freedom of speech violation.  In both contexts there is a claim of infringement of an individual's fundamental personal rights enumerated in the Declaration of Rights found in Article II of the Montana Constitution.  Accordingly, the District Court did not err when it found that the Plaintiffs established a likelihood of irreparable harm.

***Balance of the Equities and Public Interest***

¶40    The third prong in the preliminary injunction standard requires a showing that "the balance of the equities tips in the applicant's favor."  Section 27-19-201(1)(c), MCA.  The final prong requires the applicant to show that the injunction is in the public interest.

Section 27-19-201(1)(d), MCA. Although these factors often overlap when the State opposes injunctive relief, they remain distinct inquiries under the statute. In assessing the balance of equities and public interest at the preliminary injunction stage, the court weighs the competing interests based on the record before it, without finally resolving the underlying constitutional questions

¶41 The State contends that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury[,]" citing *Maryland v. King*, 567 U.S. 1301, 1303, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). We initially note that an in-chambers opinion by a single United States Supreme Court Justice does not create binding federal precedent. Moreover, the injunction in *King* caused the government "ongoing and concrete harm" because it prevented Maryland from "employing a valuable law enforcement tool" which had resulted in 58 criminal prosecutions. *King*, 567 U.S. at 3, 133 S. Ct. at 1303-04. Here, the record before the Court demonstrates no comparable harm to the government or the public interest like that identified in *King*. As discussed above, the State has yet to develop its argument that the State Policies are necessary to effectuate its state interests or to address the Plaintiffs' argument that the original birth record will remain intact. And, as the District Court found, nothing in the public record thus far reveals any concrete harm associated with the State's prior practice of amending birth certificates. Based on the personal and private nature of the constitutional rights at issue and that public interest supports the ability to obtain identification documents issued by the government, we conclude the District Court did not

26

abuse its discretion when it found the balance of equities tip in Plaintiff's favor and the preliminary injunction is in the public interest.

¶42 Finally, we turn to the State's contention that the District Court's preliminary injunction is too broad. An injunction should not "sweep any more broadly than necessary" and should be "narrowly tailored to achieve the pin-pointed objective of the needs of the case." *St. James Healthcare v. Cole*, 2008 MT 44, ¶ 31, 341 Mont. 368, 178 P.3d 696 (quoting *Tory v. Cochran*, 544 U.S. 734, 738, 125 S. Ct. 2108, 2111 (2005)). The State argues that the preliminary injunction appears to apply to all applications of the 2022 Rule, including those that have nothing to do with gender identity and that "there is no plausible contention that the Rule is *facially* unconstitutional." However, the District Court found, and we affirm that preliminary finding, that the Plaintiffs have made a prima facie showing of likelihood of success on the merits that the 2022 Rule, as applied to amendments of sex designation on government issued identification documents, violates their rights under the Montana Constitution. The 2022 Rule added the restriction that the sex listed on an individual's birth certificate may only be amended if it was mistakenly entered due to a scrivener's error or data entry or the person's sex was initially misidentified. This requirement restricts transgender Montanans in their ability to obtain birth certificates matching their gender identity. The 2022 Rule can therefore be temporarily enjoined to remove these discriminating criteria without preventing the State from adopting a new rule that does not contain sex-based classification but allows amendments to birth certificates. Thus, the State's argument has no merit.

¶43 The State also argues that the Plaintiffs do not contend that the MVD Policy itself is discriminatory. This argument misses the point that the MVD Policy appears predicated on the 2022 Rule's restrictions on sex designation amendments, a practice that we affirm has been sufficiently established at the preliminary level to show a prima facie constitutional injury. The State further argues that Plaintiffs have no standing to attack a definitional provision such as SB 458 and that the Plaintiffs do not contend that this definition itself is unlawful. This argument, again, misses the mark as the State Policies work in tandem to restrict access to a benefit for transgender Montanans that is afforded to other Montanans.

## CONCLUSION

¶44 The District Court's Order is affirmed. The State has failed in its burden of showing the District Court "obvious[ly], evident[ly], or unmistakab[ly]," *Mercer*, ¶ 9, manifestly abused its discretion. The District Court, here, did not manifestly abuse its discretion when it concluded the Plaintiffs made a prima facie showing of a constitutional injury and that each prong of the preliminary injunction standard had been met.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ KATHERINE M. BIDEGARAY

28

Justice Beth Baker, specially concurring.

¶45 I concur narrowly in the decision to uphold the preliminary injunction to the extent that it affords status quo relief to the Plaintiffs pending full consideration on the merits. My reasoning differs, however, from that applied by the District Court and from much of the rationale upon which Plaintiffs defend its ruling, as adopted by the Court's Opinion. Accordingly, I explain my views separately.

¶46 "[I]n determining the merits of a preliminary injunction, it is not the province of either the District Court or this Court on appeal to determine final matters that may arise upon a trial on the merits." *Stephenson*, ¶ 29 (citations and internal quotations omitted). My opinion here thus "in no manner anticipate[s] the ultimate determination of the questions of right involved." *Stephenson*, ¶ 29 (citation omitted). "To show a likelihood of success on the merits under § 27-19-201(1)(a), MCA, the applicant 'must present a prima facie case but need not show a certainty of winning.'" *Stephenson*, ¶ 24 (quoting *Cross*, ¶ 33).[1]

¶47 On appeal of a preliminary injunction, we apply de novo review to the trial court's legal conclusions. *Cross*, ¶ 12. The critical legal question in this appeal is whether the Plaintiffs' claim that the State Policies likely violate their rights under the Montana Constitution should be evaluated under a strict scrutiny standard. I would answer that

---

[1] We also made clear in *Stephenson* that, in light of the 2025 amendments to § 27-19-201, MCA, we would review a preliminary injunction to determine whether the moving party met each of the four elements the statute requires without regard to the "serious questions" test. *Stephenson*, ¶ 13 n.3. Here, because the District Court referenced "serious questions" on only the question of narrow tailoring—a point on which the State made no argument—I agree with the Court that we may review the court's order on the merits without remand for reconsideration.

question in the affirmative insofar as the record demonstrates that Plaintiff Doe was denied a Montana Driver's License identifying her as female for the sole reason that she could not produce a birth record matching her identity. In my view, however, the language of our Constitution's Article II, Section 4, and this Court's precedent are sufficient to make this preliminary determination. And based on the prima facie showing of infringement of a fundamental right, strict scrutiny is appropriate. I would conclude that Plaintiffs have made an adequate prima facie record showing that they are likely to succeed on the merits of their state constitutional claims for the reason that the State cannot constitutionally deny them the same opportunity that any other citizen has to obtain a document of identification that accurately depicts the person's identity.

¶48 Article II, Section 4, of the Montana Constitution, titled "Individual Dignity," begins, "The dignity of the human being is inviolable." In *Walker v. State*, 2003 MT 134, ¶ 73, 316 Mont. 103, 68 P.3d 872, we concluded that because the United States Constitution "does not expressly provide for the right to human dignity," we would "read the dignity provision of the Montana Constitution together with Article II, Section 22 to provide Montana citizens greater protections from cruel and unusual punishment than does the federal constitution." We likened that reading to our reading of Article II, Section 10, to afford Montana citizens broader protection in search and seizure cases than that provided by the federal constitution. *Walker*, ¶ 73. We said in *Walker* that "while we will analyze most cruel and unusual punishment questions implicating Article II, Section 22 of Montana's Constitution by reference to that section alone, in certain instances where Montana's constitutional right to individual dignity (Article II, Section 4) is also specially

30

implicated, we must, of necessity, consider and address the effect of that constitutional mandate on the question before us." Though we often consider equal protection claims by reference to that provision alone, in this case, human dignity becomes an important factor in analyzing the Plaintiffs' claimed denial of the equal protection of the laws and violation of their Article II rights.

¶49 At its core, "dignity" connotes persons' "capacity to live self-directed and responsible lives." Matthew O. Clifford & Thomas P. Huff, *Some Thoughts on the Meaning and Scope of Montana Constitution's "Dignity" Clause with Possible Applications*, 61 Mont. L. Rev. 301, 303 (Summer 2000) (Clifford & Huff). Treatment of a person in a degrading or demeaning manner affronts their dignity. Clifford & Huff at 307-08. "But persons' dignity could also be more indirectly violated whenever they are denied the opportunity to direct or control their own lives in such a way that their worth is questioned or dishonored." Clifford & Huff at 308.

¶50 Human dignity may be violated by denying a person the equal protection of the laws on a sex-based classification. When a person is forced to carry and display a government identification document that does not match who they look like or how they present themselves, this dishonors their dignity. When a person looks like and comports themselves as a male and is required by the State to carry identification identifying them as a female, the person is treated differently—and disrespectfully—from a person carrying female identification who looks and acts like a female.

¶51 This is not a trifling indignity. Plaintiffs are adult citizens who have an uncontested right to maintain their own identity. They have a right of personal autonomy privacy to

live as transgender individuals. *See e.g.*, *Planned Parenthood of Mont. v. State*, 2025 MT 120, ¶ 36, 422 Mont. 241, 570 P.3d 51 (noting "our history of independently rooting the individual's fundamental personal autonomy right in Montana's right of privacy, even when not recognized at the federal level"); *Cross*, ¶ 28 (reaffirming "Montana's broad personal autonomy privacy right"). As such, like all individuals, they have a protected privacy interest in the private details of their own bodies. *See Cross*, ¶ 32 (observing that gender-affirming care is not unlawful); *Planned Parenthood of Mont.*, ¶ 18 (explaining "the 1972 Constitutional Convention's intent that Article II, Section 10, of the Montana Constitution encompass a broad privacy right reflecting personal autonomy and the right to be left alone").

¶52    Government-issued identification is a necessity for the exercise of numerous civil and political rights, as well as for many ordinary functions of daily life in an ordered society. Plaintiff Doe's attested experience substantiates—at least for prima facie purposes and a likelihood of success—that the inability to obtain a government identification document that reflects who she is infringes on her capacity to protect her privacy and live a self-directed life in the same fashion as a cisgender female. Each time a person must produce identification that does not match the person's identity, they are vulnerable—in a way a cisgender person is not—to suspicion of fraud or to invasive questioning about private, intimate details. As long as the State's government-issued documents of identification allow a designation only for "sex" and not a designation for "gender," the Plaintiffs lack an equal ability to obtain identification documents reflecting their identity.

¶53 I agree with the State that the government has a compelling interest in maintaining vital statistics and in preserving original birth records. This, the Plaintiffs do not contest. As the Opinion explains, the original birth certificate will not be altered or destroyed. Opinion, ¶¶ 4, 33. At issue in their challenge, however, is the Plaintiffs' need for documents of *identification*, not the original birth record. Because the State tethers the issuance of government identification to the birth record and that record alone (as opposed, say, to permitting the sex-identity marker on the identification to differ from the birth record upon appropriate medical documentation), the Act's restrictions against amending birth certificates cannot at this stage of the case be divorced from the DOJ policy—written or unwritten—that leads to the alleged harms. The State may be able to alleviate the corresponding harms it alleges by tailoring policies to permit accurate identification with means other than a birth record alone. That will be up to the government. Because Plaintiffs cannot at present obtain the birth record the State requires to procure accurate identification documents, they have made a preliminary showing that the Act is not narrowly tailored to serve the State's asserted interest without infringing on the right to individual dignity.

¶54 "The purpose of a preliminary injunction 'is to preserve the status quo and minimize harm to all parties pending full trial' or resolution on the merits." *Stephenson*, ¶ 14 (quoting *Flying T Ranch, LLC v. Catlin Ranch, LP*, 2022 MT 162, ¶ 33, 409 Mont. 478, 515 P.3d 806) (internal quotations otherwise omitted). For purposes of our review at this preliminary stage of the case, the application of the plain language of Article II, Section 4, to the facts submitted on the preliminary injunction record is sufficient to conclude that the

33

District Court did not manifestly abuse its discretion in applying strict scrutiny to find Plaintiffs likely to prevail on the merits of at least some of their constitutional claims.

¶55 Briefly, I agree also that the District Court did not abuse its discretion in finding that Plaintiffs met the remaining factors to obtain the preliminary injunction. Based on the prima facie likelihood of success and the personal and private nature of the rights likely infringed, the record contains a sufficient showing to uphold the District Court's determination of irreparable harm. *See Cross*, ¶ 48. The inviolate nature of the right to individual dignity further tips the balance of equities toward the Plaintiffs' position while the case is litigated. On the whole, the public interest supports upholding the Plaintiffs' ability to obtain appropriate documents of government identification until the claims are resolved on the merits.

¶56 I would conclude for the reasons stated that the District Court did not manifestly abuse its discretion in preliminarily enjoining the State Policies. I therefore concur in the decision to affirm the injunction insofar as it preserves the ability of Montanans to obtain government identification documents that match their gender identity. Whether that requires invalidating SB 458 in its entirety must await determination on the merits.

/S/ BETH BAKER

Justice Jim Rice, dissenting.

¶57 Today's decision forces the State to issue falsified legal documents. According to the Court, a biological male is constitutionally entitled to have "female" noted in the *sex field* of a birth certificate. Such a result flows from the Court's flawed equal protection

34

analysis that fails at the threshold step: the Court treats a biological male and a biological female as similarly situated when both request that "female" be entered in the sex field of a birth certificate. The Court rejects what the United States Supreme Court and other courts in the country have recognized: one's gender identity choice does not constitute a protected class that establishes a basis for a sex discrimination claim. *See Trump v. Orr*, 607 U.S. ___, 146 S. Ct. 44, 46 (2025) ("Displaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment."). I dissent.

¶58    I sympathize with people burdened with gender dysphoria, and who may, as a consequence, "experience anxiety, depression, suicidality, and other attendant mental health issues." Opinion, ¶ 5. I would want them to be treated with respect and compassion as they navigate life journeys that include obvious complications, and as they deal with the pain and difficulties attendant thereto.[1]    Nonetheless, a case is not resolved by an

---

[1] Tragically, there is more than enough pain to go around for people affected by this issue, including for Chloe Cole, now in her early twenties, who identified as a transgender male and underwent a double mastectomy, and other procedures, at age fifteen, before transitioning back in the years following. As she shared with Congress:

> After my breasts were taken away from me, the tissue was incinerated. Before I was able to legally drive, . . . I had a huge part of my future womanhood taken from me. I will never be able to breastfeed. I struggle to look at myself in the mirror at times.
>
> I still struggle to this day with sexual dysfunction, and I have massive scars across my chest and skin grafts that they used, that they took from my nipples, are weeping fluid today, and they were grafted into a more masculine positioning, they said.

.   .   .

35

empathetic reaction that abdicates the law.  A correct legal analysis of the governing legal principles leads inexorably to the conclusion that the challenged statute and rules requiring a biological sex designation are not discriminatory in any constitutional sense.  Consequently, there being no legitimate likelihood of success on the merits in this case, the preliminary injunction entered by the District Court should be reversed.

¶59    An equal protection analysis involves three steps, the first of which is to identify the classes involved and determine if they are similarly situated.  *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 16, 325 Mont. 148, 104 P.3d 445.  "The goal of identifying a similarly situated class is to isolate the factor allegedly subject to impermissible discrimination.  Thus, two groups are similarly situated if they are equivalent in all relevant respects other than the factor constituting the alleged discrimination."  *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 29, 374 Mont. 453, 325 P.3d 1211 (internal citation removed).  "When the single distinguishing factor between the two classes constitutes a 'fundamental distinction' relative to the underlying purpose of the statute, the classes are not similarly situated."  *Hensley v. Mont. State Fund*, 2020 MT 317, ¶ 21, 402 Mont. 277, 477 P.3d 1065 (citation omitted).  "If the classes are not similarly situated, then the first criterion for proving an

> When my specialists first told my parents that they could have a dead daughter or a live transgender son, I wasn't suicidal. I was a happy child who struggled because she was different.  However, at 16, after my surgery, I did become suicidal.  I'm doing better now, but my parents almost got the dead daughter promised to them by my doctors.  My doctors had almost created the very nightmare they said they were trying to avoid.

*The Dangers and Due Process Violations of "Gender-Affirming" Care for Children: Hearing Before the Subcomm. on the Constitution and Limited Government, H. Comm. on the Judiciary*, 118th Cong. 13–14 (2023).

equal protection violation is not met, and it is unnecessary to analyze the challenge further." *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192 (citation omitted).

¶60    The Court states that the classes at issue here are "transgender Montanans seeking to amend the sex designation on their birth certificates or driver's licenses and cisgender Montanans seeking to amend the sex designation on their birth certificates or driver's licenses." Opinion, ¶ 29.  The Court states that "transgender and cisgender Montanans are similarly situated in their need for identification documents; here, birth certificates and driver's licenses that list the sex they identify with and believe themselves to be." Opinion, ¶ 30.  The Court proffers that "transgender and cisgender Montanans are treated unequally in their ability to obtain amended birth certificates because the State Policies allow cisgender people to obtain amended birth certificates . . . while a transgender Montanan is not allowed to obtain an amended identity document." Opinion, ¶ 29.   The Court's construction of these "classes" is flawed in multiple ways; indeed, these are not proper, similarly situated classes in any respect.

¶61    First, the classes the Court proposes are only theoretically viable, and not supported in fact, starting with its definition of "cisgender people," which the Court proffers are people who "have a gender identity that aligns with their sex assigned at birth." Opinion, ¶ 5.  However, this use of "cisgender"—a term that is not only inaccurate but potentially offensive, as explained below—mistakenly theorizes that all people living consistent with their birth sex have made a deliberate "gender identity" decision to adopt such a lifestyle. However, in this context, a "gender identity" and a gender identity choice are inapplicable

37

to males and females living consistent with their biological birth sex, because they have made no such choice and simply live as they physically originated. There is no evidence whatsoever that every such person has made a "gender identity" decision, as it is completely unnecessary.[2] The need to "gender identify" arises only when people want to live a lifestyle *inconsistent* with their biological origin. Choices to "identify" with a gender that departs from one's birth sex are made by people suffering from gender dysphoria, but no "gender identity" choice is necessary in order to live consistently with a person's biological sex—that is, the physical reality of their biology.

¶62  Consequently, the term "cisgender" is false and a mislabeling of people to the extent it presumes that *all* males and females living consistent with their birth biology have made a decision to "gender identify" with their own biological sex. While some "cisgender" Montanans may have adopted a gender identity, perhaps in a return from an earlier identity chosen when gender dysphoric, many do not and should not be compelled to, or so designated, to create theoretical classes. The undiscerning, overbroad, theoretical use of the term "cisgender" is an attempt to bring the entire population of the world—including those who live according to their birth biology and do not suffer gender dysphoria—into a common "world" of gender dysphoria and gender identity, so that a journey of gender

---

[2] According to recent polling, Americans are increasingly rejecting the notion that gender identity is distinct from biological sex. *Compare* Kim Parker, Pew Research Center, *Americans' Complex Views on Gender Identity and Transgender Issues* (June 28, 2022) ("60% say a person's gender is determined by their sex assigned at birth, up from 56% in 2021 and 54% in 2017"), https://perma.cc/GY94-UAAL; *with* Juliana Horowitz, Pew Research Center, *U.S. teens are less likely than adults to know a trans person, more likely to know someone who's nonbinary* (Jan. 24, 2025) ("65% of adults say a person's gender is determined by their sex at birth, while 33% say gender and sex can differ"), https://perma.cc/G3GJ-REQS.

identification is universally assigned to all people. As noted, in this context, not all people "gender identify," but rather simply live according to their biological sex, and thus the asserted "cisgender" class is part of a false construct or dichotomy used to create straw-man, similarly-situated classes necessary to justify an allegation of disparate treatment. Thus, the "cisgender" and "transgender" classes asserted here are not similarly situated for equal protection analysis because they are not classes capable of meaningful comparison. Factually, the "cisgender" class the Court proffers is not a unified or coherent group. Its members do not all share, or even accept, the defining trait the Court relies upon, that being engagement with making a gender identity choice. *See Lyng v. Castillo*, 477 U.S. 635, 638, 106 S. Ct. 2727, 2729 (1986) (close relatives as a class "do not exhibit obvious, *immutable*, or distinguishing characteristics that *define them as a discrete group*" (emphasis added)). Furthermore, if being "cisgender" is a matter of one's subjective belief, members of the "cisgender" class can move in and move out of the class at their will. The Court's definition of "cisgender" thus creates a meaningless distinction, imposing a framework of subjective mentality on people who have neither accepted such a framework nor acted upon it. The Court cannot meaningfully compare two classes when one class is defined by a concept that is inapplicable and rejected by its supposed members. *See Hensley*, ¶ 21.

¶63 Assuming *arguendo* that the "cisgender" class is capable of being applied to all Montanans, including upon those for which it would be against their will, even then these two groups are not similarly situated. One group of people live according to their birth sex. The other group of people voluntarily choose to live apart from biological fact through

39

gender identification—a self-directed departure that the State neither compels nor prohibits. Accordingly, these classes are not identical in all respects relevant to the challenged law (whether a birth certificate can contain false information) and are not similarly situated. *Rausch,* ¶ 18.[3]

¶64 Also factually erroneous is the Court's assertion, within its proffered class definitions, that one's biological "sex" is something merely "assigned" at birth, as if it is random or sequential. Opinion, ¶ 5. This is part of the false terminology employed by the Court in its mission to alter the meaning of biological sex such that it is equivalent to gender identity. Of course, if ascribing to fact, biological birth sex is not "assigned" by a mindless random or alternating assignment process to provide a temporary sex designation, but rather, sex is an objective and factual observation recorded at birth in a world of only two possible options, male or female, a determination made for each individual based upon

---

[3] Looking at the issue more broadly, billions of people over millennia have likewise lived without deciding to "gender identify," and it is both historically inaccurate and a modern error, into which the Court has fallen, to label and categorize all people as having done so. Further, the billions of people living today hold greatly differing views on the entire concept of "gender identification," perhaps a greater variety of views than even the number of gender identity categories that have been proffered to date. Some people are supportive of such decisions, others are neutral or ambivalent about the idea that a person can choose to pursue a gender identity different than their biological sex, while others deem such gender identification decisions as ineffectual or at least unnecessary, and still others subscribe to philosophical and religious tenets that view elective gender identification as anathema contrary to the nature of creation. These varying views simply illustrate that, while it may be appropriate to label people as belonging to a gender identity category who have expressly chosen and embraced such label, including "cisgender," it is highly inappropriate to label people as belonging to a gender identity category who have made no such choice, particularly, those people who do not believe in or who object to such choices. For those people, the "cisgender" label is false, as well as offensive to some, and the Court's use of it is factually incorrect. Consequently, the Court's conclusion that "transgender and cisgender Montanans are similarly situated" in their need for documents that "list the sex they identify with and believe themselves to be," Opinion, ¶ 30, is incorrect for this reason alone, in addition to others.

their physical biology. There can be an error in the preparation of a birth certificate or driver's license, but there can be no error in the kind of chromosomes a person possesses.

¶65 To be clear again, I do not question the sincerity of the Plaintiffs' beliefs about their gender identities. As their briefing explains, gender identity reflects a person's "inner sense of belonging" to a particular gender, and neither the Court nor the State has any power to dictate how a person feels. Yet it does not follow, and absolutely nothing in the Constitution requires, that the State is required to depart from historical, biological sex and replace it with an individual's gender identity on important government documents such as birth certificates. In contrast to gender identity, birth sex is an immutable historical and biological fact, unaffected by one's self-identity, in the similar way that, for example, a person's date of birth would be. *See United States v. Skrmetti*, 605 U.S. 495, 550, 145 S. Ct. 1816, 1851 (2025) (Barrett, J., concurring) ("The Sixth Circuit held that transgender individuals do not constitute a suspect class, and it was right to do so. To begin, transgender status is not marked by the same sort of obvious, immutable, or distinguishing characteristics as race or sex." (internal quotations and citation omitted)). Among other purposes, state and national health statistical reporting systems are premised upon such accurate historical data, and requiring the State to replace birth sex with an individual's subjective, self-determined gender identity undermines the birth certificate's core function as a reliable record of historical fact.

¶66 Gender identity is thus distinct from biological sex. Formerly, our society recognized, consistent with biological sex, just two gender categories as well. In more recent years, there has been a proliferation of human identification categories,

including transgender, often referenced in extended acronyms. Examples include LGBTQQIP2SAA (lesbian, gay, bisexual, transgender, queer, questioning, intersex, pansexual, two-spirit, asexual, ally) or 2SLGBTQ+ (the plus sign being anything else). *See* Loyola University, *Thrive Center for Student Success, Terms and Definitions* (2025) (defining LGBTQQIP2SAA), https://perma.cc/59V7-YAR2; *Building Lgbtq+ Inclusive Legal Systems*, 34 Ind. Int'l & Comp. L. Rev. 1, 27–28 (2024) (defining 2SLGBTQ+). Importantly here, certification of birth sex is a historical fact determined by biology; lifestyles lived out pursuant to a decision to "gender identify" are not, and clearly they are not the same thing. Our jurisprudence rests upon this understanding of sex. In *Snetsinger*, the Court rested its decision on the treatment of "same-sex" and "opposite-sex" couples, which required recognition of sex as an objective, biologically verifiable characteristic that placed people on the same side or opposite side of a biological line. *See Snetsinger*, ¶ 27. National jurisprudence reaches the same conclusion, considering sex to be immutable, and not arbitrary, for purposes of equal protection. *See United States v. Virginia*, 518 U.S. 515, 533, 116 S. Ct. 2264, 2276 (1996) ("Physical differences between men and women, however, are enduring: The two sexes are not fungible . . . ." (internal quotations and citation omitted)); *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S. Ct. 1764, 1771 (1973) (plurality opinion) ("Sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."). Even the most extensive genital surgery cannot alter the immutable reality of biological sex, founded in one's DNA. *See United States v. Robbins*, 75 F.4th 964, 966 (8th Cir. 2023) (forensic experts can reliably determine, using nothing more than bone fragments and DNA, whether a decedent is male

or female).   Consistent therewith, the Legislature defined sex as the biological classification of human beings as male or female, determined by chromosomes, gonads, and unambiguous internal and external genitalia, for the purpose of sexual reproduction. Section 1-1-201, MCA (2023 Mont. Laws ch. 685, § 1). As Richard Dawkins succinctly put it: "As a biologist, there are two sexes and that's all there is to it."[4]

¶67    The Court's assertion that, in this case, "[t]ransgender discrimination is, by its very nature, sex discrimination," Opinion, ¶ 27, is true only if words are not accorded their true meanings, and assigned new ones, such that sex no longer means biological sex based upon physical science, but rather also means one's decision to "gender identify" with something other than their birth sex.  The fact that a biological male cannot have "female" noted on his birth certificate is based on the reality that every Montanan has a biological sex and that sex rather than gender identity is recorded on birth certificates.  This is "not a stereotype" that either facially discriminates or serves as a proxy to disfavor transgender Montanans. *Anderson v. Crouch*, 169 F.4th 474, 482 (4th Cir. 2026) (quoting *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68, 121 S. Ct. 2053, 2063 (2001)).  Under the State's Policies, the birth certificate of every Montanan must be biologically accurate and every Montanan may seek an amendment only to correct for biological inaccuracies.  Thus, "[g]enerally speaking,

---

[4] Piers Morgan, *Richard Dawkins vs Piers Morgan On Religion and Gender* at 16:30, YouTube (Mar. 20, 2023), https://www.youtube.com/watch?v=505UazMNgLg; *see also* Colin Wright, Wall Street Journal, *A Biologist Explains Why Sex Is Binary* (Apr. 9, 2023) ("There are only two sexes. This is true throughout the plant and animal kingdoms.  An organism's sex is defined by the type of gamete (sperm or ova) it has the function of producing.  Males have the function of producing sperm, or small gametes; females, ova, or large ones.  Because there is no third gamete type, there are only two sexes.  Sex is binary."), https://perma.cc/F8WH-LXAC.

laws that apply evenhandedly to all unquestionably comply with the Equal Protection Clause." *Vacco v. Quill*, 521 U.S. 793, 800, 117 S. Ct. 2293, 2298 (1997) (citation omitted). To condemn the State's Policies as discrimination against transgender individuals on the basis of their sex, when the State's Policies require only a male's birth certificate to have an "M" or a female's birth certificate to have an "F," requires the sex field on a birth certificate to be synonymous with gender identity. However, as shown above, the terms sex and gender identity cannot be equated because they mean very different things. If words retain their factual meaning, there is no discrimination at all, because discrimination against transgender Montanans identified by the Court exists only after the Court conflates biological sex with gender identity.

¶68 There is no constitutional violation here because the State's statutes and regulations requiring the accurate reporting of birth sex treat every person equally. The sole operative criterion under the State's Policies is whether the requested amendment accurately reflects the applicant's birth sex. These policies treat everyone the same and do not treat anyone differently based on transgender status. *No one* is permitted to alter their birth certificate in a way that would incorrectly state their birth sex. Rather, the law permits an amendment, by any person, only to correct an error in the original *recording* of birth sex. Thus, if birth sex was accurately recorded biologically, no amendment is permitted, and, contrary to the Court's reasoning, it is not merely certain gender-identified people who are prohibited from making such an amendment; all people are. *See Gore v. Lee*, 107 F.4th 548, 556 (6th Cir. 2024) ("Tennessee does not guarantee anyone a birth certificate matching gender identity, only a certificate that accurately records a historical fact: the sex of each newborn.");

44

*Corbitt v. Sec'y of the Ala. L. Enf't Agency*, 115 F.4th 1335, 1346 (11th Cir. 2024) ("[T]he Policy does not impose a sex-based classification. It does not distinguish between males and females in any respect. Rather, it applies to *all* individual[s] wishing to have the[ir] sex changed on their Alabama driver['s] license[.]" (internal citations omitted; alterations and emphasis in the original)). The State's rule carries the additional advantage of being the truth. People cannot self-identify themselves into separate legally protected classes that are contrary to historical and biological principles and force the State to recognize and be bound by them, that is, to govern contrary to scientific reality. Birth sex is immutable. Accordingly, the State's Policies do not treat Montanans differently based on transgender status and transgender status in this case is not the factor allegedly subjecting transgender Montanans to impermissible discrimination. *See Hensely*, ¶ 21. The analysis therefore proceeds under rational-basis review, which the State's Policies easily satisfy. *See Gazelka v. St. Peter's Hospital*, 2015 MT 127, ¶ 21, 379 Mont. 142, 347 P.3d 1287.

¶69 The Court states that "transgender and cisgender Montanans are similarly situated in *their need* for identification documents; here, birth certificates and driver's licenses that list the sex they identify with and believe themselves to be." Opinion, ¶ 30 (emphasis added). However, the question here is not whether both groups share a subjective "need" for self-identification to be reflected on identity documents; it is whether the State's Policies treat similarly situated people differently. The State's Policies correctly define sex based on biology and accordingly require the sex field in everyone's birth certificate to be biologically accurate. *See* § 1-1-201, MCA (2023 Mont. Laws ch. 685, § 1). If an applicant seeking an amendment to the sex field in his or her birth certificate requests a

45

change to the sex field that is biologically accurate, the applicant is granted the amendment; if the applicant requests an amendment to the sex field that is biologically inaccurate, the request is denied. Both transgender and cisgender Montanans can fall into either category and therefore classes proffered by the Court are not treated differently.[5]

¶70 The Court's conclusion that the Plaintiffs are likely to succeed in the litigation thus requires a purposeful conflation of two different things, biological sex and gender identity, into a singular concept for purposes of equal protection. By so doing, the Court legislates a change to the rules and statutes; no longer can the State require that a birth certificate reflect the historical fact of biological sex at the time of birth. Rather, from now on, the State must instead permit a person's birth certificate to report "the sex they *identify with*" at the current time—meaning, that is, not sex, but gender identity. Opinion, ¶ 30 (emphasis added). The Court thus makes one's subjective belief the mandatory operative criterion for what the State must place in the sex field of these documents. The practical effect is indistinguishable from a judicial redefinition of biological sex itself, as if a court was so empowered, and necessarily forecloses use of the indisputable understanding of sex as an

---

[5] The Court's analysis also treats transgender status as the only factor separating the groups it draws ("the classes as transgender Montanans seeking to amend the sex designation . . . and cisgender Montanans seeking to amend the sex designation . . ."), Opinion, ¶ 29, thus implying that, apart from being transgender, the two identified groups are equivalent in every relevant respect, which is incorrect. An additional factor is the nature of the requested amendment, that is, whether the requested amendment to the applicant's sex field would correct the document to match the applicant's biological sex. *See Planned Parenthood of Mont. v. State*, 2024 MT 178, ¶ 27, 417 Mont. 457, 554 P.3d 153 ("Two groups are similarly situated if they are equivalent in all relevant respects other than the factor . . . constituting the alleged discrimination."). Similarly, the logic of the Court's decision holds only if there are only two genders, but there are many more. *See*, i.e., Loyola University, *Thrive Center for Student Success, Terms and Definitions* (2025) (explaining the various gender identifies in the acronym "LGBTQQIP2SAA"), https://perma.cc/59V7-YAR2.

objective, biologically grounded characteristic. Consequently, the Court departs from the essence of equal protection and requires special treatment for some. A transgender person will now be able to do what others cannot: compel the State to issue a birth certificate that departs from their birth sex and reflects a different "sex" based upon their gender self-identity. Perhaps the Court should, to be consistent with the change in purpose it is ordering, also legislate a change in terminology and rename "birth certificates" to be "identity certificates," because, in the end, birth certificates will no longer reliably report birth sex; now, a reader of a certificate will only be assured that the certificate reflects a person's current gender identity.

¶71 The Sixth Circuit, in *Gore*, examined a statutory scheme that effectively required the same thing the State's Policies require: a person's birth certificate must be biologically accurate and amendments to the sex field are permitted only when "an original entry on a certificate was factually inaccurate at the time of the recordation." *Gore*, 107 F.4th at 554 (citing § 68-3-203, Tenn. Code Ann.). The plaintiffs argued that this requirement stigmatized them by effectively "divulge[ing] their transgender status when they present their birth certificates for employment or when they apply for a passport." *Gore*, 107 F.4th at 554. The Sixth Circuit rejected the plaintiff's equal protection claim:

> Tennessee's birth-certificate policy treats like alike. It makes one relevant distinction. It distinguishes between those applicants who produce evidence that the doctor erred in identifying their biological sex at birth and those who do not. Given Tennessee's aim of accurately recording the biological sex of newborns—was the child a boy or a girl?—that distinction is rational. *The distinction also treats the sexes identically*. Under Tennessee law, anyone may amend their certificate if they provide "documentary evidence" showing the certificate contains "incorrect data." That policy does not impose any special restraints on, and does not provide any special benefits to, applicants

47

due to their sex. It does not impose "one rule for" males and "another for" females. Nor does it prefer one sex over another when individuals try to amend their birth certificates. The amendment application does not ask for the sex of the individual, and eligibility for it does not turn on the sex of the individual. The policy treats the sexes equally.

*Gore*, 107 F.4th at 555 (internal citations and quotations removed; emphasis added). The court asked: "How, it's worth asking, could a government keep uniform records of any sort if the disparate views of its citizens about shifting norms in society controlled the government's choices of language and of what information to collect?" *Gore*, 107 F.4th at 557. The Sixth Circuit concluded: "No person, male or female, may amend a birth certificate simply because it conflicts with their gender identity. Tennessee does not guarantee anyone a birth certificate matching gender identity, only a certificate that accurately records a historical fact: the sex of each newborn." *Gore*, 107 F.4th at 556.

¶72 The U.S. Supreme Court itself has twice indicated that biological accuracy requirements are not discriminatory. *See Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024), *cert. granted, judgment vacated, and remanded*, 145 S. Ct. 2840 (2025) (granting, vacating, and remanding Oklahoma's male and female birth certificate requirements considering rational basis review applied in *Skrmetti*). More directly, in *Orr*, a case with procedural posture and substantive issues nearly identical to the one before us today, the Supreme Court summarily affirmed the lower court's dismissal of an equal protection challenge to the federal passport policy requiring display of sex at birth. The U.S. Supreme Court explained: "Displaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely

48

attesting to a historical fact without subjecting anyone to differential treatment." *Orr,* 607 U.S. at \_\_\_, 146 S. Ct. at 46.

¶73 Similarly, the Court's assumption that gender equates to sex was flatly rejected by the U.S. Supreme Court in *Skrmetti*. While *Skrmetti* did not address precisely the same issue as here, the reasoning is nonetheless persuasive. In *Skrmetti*, the Supreme Court explicitly rejected the argument that a law prohibiting puberty blockers and cross-sex hormones for minors to treat gender dysphoria or facilitate transition inherently discriminates on the basis of sex, explaining instead that the law classifies based on medical purpose and therefore warrants only rational-basis review: "*Neither of the above classifications turns on sex.* Rather, SB1 prohibits healthcare providers from administering puberty blockers and hormones to minors for certain medical uses, regardless of a minor's sex. . . . We also reject the argument that the application of SB1 turns on sex." *Skrmetti,* 605 U.S. at 511–12, 145 S. Ct. at 1829 (emphasis added); *see also Anderson,* 169 F.4th at 487–88 (Applying *Skrmetti* and reasoning that, "[t]he fact that only transgender individuals experience gender dysphoria does not mean [a medicaid plan that doesn't cover sex-change surgeries] discriminates based on transgender status, any more than the fact that 'only women can become pregnant' made the exclusion in *Geduldig v. Aiello*, 417 U.S. 484, 94 S. Ct. 2485 (1974) facially discriminatory.").

¶74 The reasoning of these cases is not distinguishable on the basis that the Montana Constitution is different than the U.S. Constitution. *Compare* U.S. Const. amend. XIV § 1 (the federal equal protection clause) *with* Mont. Const. art. II, § 4 (Montana's equal

49

protection provision). The Court's errors are rooted in a fundamental misunderstanding about equal protection principles, including the nature of the classes at issue.

¶75 The Court's class analysis error can be further highlighted by applying it hypothetically to a different immutable trait. A man, A.B., identifies as "trans-aged": although born January 15, 2007, he identifies as born on January 15, 1955.[6] To express his age-fluid identity, A.B. dresses and presents as someone in his seventies rather than someone in his late teenage years. He claims the age-accuracy law causes him significant anxiety and distress, especially during traffic stops where officers notice the mismatch between his appearance and the listed birth year, leading to embarrassment. A.B. requests amendments to his driver's license and birth certificate to reflect his identified birth date as January 15, 1955, instead of 2007 (his actual birth date). The State denies both requests because the change he requests does not correct a recording error and contradicts his objective birth date, and thereby is prohibited by law and policy.

¶76 Focusing here solely on class analysis, that is, whether two similarly situated classes would exist for trans-aged and "cis-aged" Montanans, the logic of today's Opinion would

---

[6] This hypothetical is premised upon actual cases. "Transage means a person's age identity is different than their chronological age or chrono age. Transage people can be any age and are not all younger than their chrono age. Transage people may also fluctuate between ages, be multiple ages or be no specific age." Gina Florio, *Transage Activists Now Claim Age Is a Social Construct*, Evie Magazine (Jan. 3, 2023), https://perma.cc/4EKV-PUZ9. "In Canada, Stefonknee (formerly Paul) Wolscht is a 46-year-old transgendered and transaged woman. Wolscht, the subject of a lengthy documentary film by the *Transgender Project*, argues that she is a six-year-old girl." Ardee Coolidge, *Transgender, Transrace, Transage, and the Search for Truth*, Care-Net.Org (May 13, 2016), https://perma.cc/4YWZ-92UJ. A European court in 2018 rejected a man's petition to legally change his birth date from 1949 to 1969, explaining, in part, that if his request was granted "age requirements would become meaningless." Camila Domonoske, *Dutch Man Loses Bid To Change His Age*, NPR (Dec. 4, 2018), https://perma.cc/F9MX-25NW.

require the conclusion that the age-accuracy law discriminates against trans-aged individuals. Just as the Court concludes that it is discriminatory for "cisgender" Montanans to be able to obtain documents matching their gender identity, while transgender Montanans cannot, *see* Opinion, ¶¶ 29–30, the same reasoning would require the Court to also conclude that it is discriminatory for "cis-aged" Montanans to be able to obtain documents matching their identified age, while trans-aged Montanans could not. In fact, the Court's own language from today's decision could be applied virtually verbatim to the age-accuracy law scenario, as follows:

> [T]he inability of trans[-aged] Montanans to receive government-issued identification documents accurately reflecting their [identified aged] is fundamentally about the nature of [age].
>
> .  .  .
>
> Trans[-age] discrimination is, by its very nature, [age] discrimination.
>
> .  .  .
>
> Under the State Policies only cis[-aged] Montanans are eligible for birth certificates and driver's licenses which match their [identified age]. Upon discovering that her [age] was incorrectly listed as [the wrong year] on her identity documents, a cis[-aged] woman can update her identity documents. Thus, a cis[-aged] Montanan can obtain a birth certificate that matches their [identified age]. However, a trans[-aged] Montanan, such as [A.B.], is not allowed to have birth certificates and identity documents which match [his identified age]. Thus, trans[-aged] and cis[-aged] Montanans are treated unequally in their ability to obtain amended birth certificates because the State Policies allow cis[-aged] people to obtain amended birth certificates, including a change to the [birth year] listed on their original birth certificate if the [birth year] was incorrectly identified due to a scrivener's error or incorrect data entry, while a trans[-aged] Montanan is not allowed to obtain an amended identity document.
>
> .  .  .

51

> We conclude trans[-aged] and cis[-aged] Montanans are similarly situated in their need for identification documents; here, birth certificates and driver's licenses that list the [age] they identify with and believe themselves to be.

Opinion, ¶¶ 27–30 (adapted for analogy). These sentences may sound absurd when applied to age, yet they are functionally identical to the reasoning the Court employs for sex.

¶77 Now consider the amendment process and the difference between a "cis-aged" and trans-aged individual. A.B. and C.D. both seek to amend their birth certificate. C.D. was actually born in 1955, but his birth certificate contains a clerical error listing 1956. He requests a correction to reflect his true birth year of 1955. A.B. who was actually born in 2007, but identifies as born in 1955, also requests a change to list 1955 as his birth year.

¶78 The State grants C.D.'s request (correction of a factual error) but denies A.B.'s request (override of a factual birth year). C.D. seeks alignment with his actual birth date; A.B. seeks to override his actual birth date. The policy applies the same neutral criterion—actual date of birth—to both applicants. If the date of birth field on a birth certificate is kept grounded in historical fact, A.B. and C.D. are not similarly situated. Similarly, if the sex field on a birth certificate is kept grounded in biological fact, a transgender woman (biological male) is not similarly situated to a biological female when both seek an "F" in the sex field.[7]

---

[7] Analogies are rarely perfect and the comparison to age is not either: age and biological sex trigger different levels of scrutiny in equal protection analysis, for example. But levels of scrutiny only come into play once discrimination has been identified. *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192 ("If the classes are not similarly situated, then the first criterion for proving an equal protection violation is not met, and it is unnecessary to analyze the challenge further."). Of course, I do not offer the analogy to in any way diminish the challenges faced by those choosing a transgender identity, but merely to illustrate the logical flaw the Court has adopted today.

¶79    Montana Medicaid's coverage of cervical-cancer screening is a service necessary only for individuals with a cervix (biological females). Admin. R. M. 37.82.701(m) (2025); 42 U.S.C. § 1396a(a)(10)(A)(ii)(XVIII). A transgender woman (biological male) should rightfully be denied coverage for a cervical screen because he doesn't have a cervix, while a biological female should receive coverage because she has a cervix. Under the Court's sweeping assertion though, this differential outcome must be framed as "transgender discrimination" that is "by its very nature, sex-based discrimination," triggering strict scrutiny. The State would then bear the heavy burden of proving the policy "is narrowly tailored to serve a compelling government interest." *Snetsinger*, ¶ 17. Any argument that denying a biological male a cervical screen stems not from sex discrimination but from biological reality of the screening itself would necessarily be dismissed as discriminatory against transgender Montanans.

¶80    Finally, the Court declares: "Being transgender is also a suspect class." Opinion, ¶ 28. The Court provides no definition for what "being transgender" means, no authority, and no workable analysis for why being transgender is a suspect class. The closest the Court comes to providing a definition is in the statement of facts section where it recites: "As background information [only], . . . [a] transgender person is someone who has a gender identity that differs from their assigned sex at birth." Opinion, ¶ 5. The Court's vague description of transgender status incorporates something entirely subjective and fluid, turning on a person's internal gender identification. *See* Opinion, ¶¶ 5, 29; *cf. Lyng*, 477 U.S. at 638, 106 S. Ct. at 2729 (suspect class historically defined as whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a

53

discrete group; and they are not a minority or politically powerless") (citation omitted)).

Once a subjective, fluid self-identity becomes a basis for a suspect class, there is no logical stopping point to equally recognizing any number of other suspect classes defined by one's subjective motivations. *See Skrmetti*, 605 U.S. at 550, 145 S. Ct. at 1851 (Barrett, J., concurring) ("The Sixth Circuit held that transgender individuals do not constitute a suspect class, and it was right to do so. To begin, transgender status is not marked by the same sort of obvious, immutable, or distinguishing characteristics as race or sex." (internal quotations and citations removed)).

¶81 As a final point, the District Court invoked the "serious questions" test and concluded the "Plaintiffs have succeeded in raising a serious question on the merits as to whether the challenged state actions are narrowly tailored," an approach the Legislature has explicitly prohibited. *See* § 27-19-201(4)(b), MCA ("The court may not use . . . the serious questions test."). Such an error alone requires reversal. The Court attempts to downplay the mistake by observing that the District Court ultimately found that each of the four elements of the preliminary injunction test were satisfied, Opinion, ¶ 20, but applying the wrong legal standard cannot be cured simply by claiming the court would have reached the same result under the correct one. *See Stensvad v. Newman Ayers Ranch, Inc.*, 2024 MT 246, ¶ 30, 418 Mont. 378, 557 P.3d 1240 (remanding for application of "the applicable preliminary injunction standard"). This is akin to a court using the preponderance of the evidence standard for a criminal conviction. A court abuses its discretion, as a matter of law, when the wrong standard of review is applied. *See, e.g., Blaine Cnty. v. Stricker*, 2017 MT 80, ¶ 27, 387 Mont. 202, 394 P.3d 159 (Lower court

54

applied the wrong standard of review based on Montana Administrative Procedure Act, § 2-4-704, MCA, requiring reversal: "As a matter of law, the Commission applied the wrong standard of review; it therefore abused its discretion."). Just as a criminal defendant would be entitled to a new trial under the correct burden of proof, the Legislature is entitled to have the preliminary injunction decision on its statute made under the proper legal framework. *See All Families v. Dep't of Pub. Health*, 2026 MT 64, ¶ 79, ___ Mont. ___, ___ P.3d ___ (Rice, J., dissenting) ("While the [district court] also addressed other factors, the Legislature is entitled to a preliminary injunction determination on its challenged statute that is unadulterated by additional injunction considerations it has now rejected twice. Thus, remand for a clean review would be appropriately ordered here.").

¶82 The Court's discussion of the preliminary injunction factors proceeds from the premise that several constitutional violations are likely. Because no such constitutional violations are likely when the claims are viewed with an understanding that it is not discriminatory in any constitutional sense to require a male to have "male" noted in the sex field of a birth certificate, all four factors weigh in the State's favor. The interest in maintaining biologically accurate birth certificates and driver's licenses is so foundational to the very purpose of these documents, no court should have reasonably questioned it. The District Court's decision should be reversed and the preliminary injunction denied.[8]

---

[8] The Special Concurrence's analysis of a potential individual dignity claim is incorrect for many of the same reasons described herein: gender identity is not conveyed on a birth certificate, only a person's sex is, and the Constitution does not and could not command the State to falsify the sex field on legal documents. These irrefutable factual and legal truths are not altered by our respect for the dignity of each person. The Court is correct not to analyze individual dignity claims here because any such claims are procedurally barred at multiple levels. *See Day v. Payne*, 280 Mont.

/S/ JIM RICE

Chief Justice Cory J. Swanson joins in the dissenting Opinion of Justice Jim Rice.

/S/ CORY J. SWANSON

Chief Justice Cory J. Swanson, dissenting.

¶83 I fully join Justice Rice's Dissent. I write separately to address concerns about our process and the Court's unnecessary engagement in law-making which belongs to the Legislative Branch.

¶84 The challenge in any of these politically-charged cases is to ensure we follow our established rules of jurisprudence and do our job—not the policy makers' jobs—under the Constitution. We should set aside the controversy of the issues to decide the case exactly as we would any other: facts and law, not politics. The Majority has stepped past the correct and readily available resolution to instead intrude upon the policy-making-and-enforcing authority of the Legislative and Executive Branches. It is both unfortunate and unnecessary.

**Plaintiffs Fail to Show Standing or Entitlement to a Preliminary Injunction Against the MVD Driver's License Policy**

¶85 Every litigant must demonstrate standing to enter the courtroom and avail themselves of the opportunity to be heard for resolution of a conflict. Courts only

273, 276, 929 P.2d 864, 866 (1996) (no new legal claims or theories on appeal); *Kulstad v. Maniaci*, 2010 MT 248, ¶ 49, 358 Mont. 230, 244 P.3d 722 (avoid constitutional questions when possible.); *Planned Parenthood of Mont. v. State*, 2022 MT 157, ¶ 20, 409 Mont. 378, 515 P.3d 301 (preliminary injunction proceedings are not the proper vehicle for establishing new precedent).

adjudicate justiciable controversies; they do not issue advisory opinions. Under both the United States Constitution's "cases or controversies" requirement in Article III, and the Montana Constitution's granting of district courts with jurisdiction over "all civil matters and cases at law and equity" in Article VII, Section 4, a party must prove standing. *Noland v. State*, 2025 MT 294, ¶ 9, 425 Mont. 328, 581 P.3d 47.

¶86    To do so, a plaintiff must articulate an act by the defendant, which causes a "specific and definite harm personally suffered, or likely to be personally suffered," *Larson v. State*, 2019 MT 28, ¶ 46, 394 Mont. 167, 434 P.3d 241, a causal connection between the act and the injury, and demonstration that the court can afford relief to redress the injury. *Noland*, ¶ 10; *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 32, 360 Mont. 207, 255 P.3d 80.

¶87    Plaintiff Jane Doe alleges the MVD established a policy that prohibits persons from obtaining a driver's license matching their expressed gender identity and filed a motion seeking an order to enjoin "the new MVD policy and practice as applied to issuing amended driver's licenses." But there is no "new" MVD policy or practice in this case record. The only evidence of an MVD denial comes from Doe's Declaration in support of the Plaintiffs' Motion for Preliminary Injunction. Doe's Declaration bears examination.

¶88    First, Doe visited the DPHHS office of Vital Records on September 28, 2023. There, an employee stated applicants could obtain a birth certificate with a changed sex designation, and Doe received assistance filling out the application. The employee stated it would take about six months for the amended birth certificate to be completed.

¶89    Still within that six-month window of waiting for the amended birth certificate, Doe visited the Helena MVD office on December 14, 2023. Doe attempted to get a driver's

license with a changed sex designation. The employee stated they could not issue a driver's license with an amended sex designation "without a court order and a corrected birth certificate." In other words, MVD did not deny the request. It required an amended birth certificate, which Doe had not received because it was only two months into the expected six-month processing timeline from DPHHS. This declaration provides no indication that MVD had enacted a policy contrary to the Plaintiffs' request: an amended driver's license after receiving an amended birth certificate.

¶90 Only after MVD told Doe the agency needed an amended birth certificate did Doe receive the DPHHS rejection on March 4, 2024, that no sex designation change was allowed under Admin. R. M. § 37.8.311(5)(a) (2022). Doe never demonstrated MVD's policy *currently* refuses to provide an amended driver's license upon receipt of an amended birth certificate. Indeed, there is no record of what the so-called "new MVD policy and practice" is, after DPHHS promulgated new administrative rules on February 20, 2024, implementing the statute and responding to the Thirteenth Judicial District Court's injunction against Senate Bill 280 and Admin. R. M. § 37.8.311(5)(b) (2022). *Marquez v. State*, No. DV 21-873, at *35 (Mont. Thirteenth Judicial Dist. Apr. 21, 2022).[1] Plaintiff Doe alleges an injury arising from an inability to obtain an amended birth certificate and

---

[1] The Governor and DPHHS were the named Defendants in that suit, not the Attorney General or MVD of the Department of Justice. The District Court Order was not appealed. The Legislature responded by passing SB 458 in the 2023 Legislature, which added the definitions of "female," "male," and "sex" to the law at § 1-1-201(1)(a), (b), and (f), MCA. 2023 Montana Laws ch. 685 (S.B. 458). DPHHS amended Admin. R. M. § 37.8.311(5) (2022), which is the subject of this suit.

driver's license showing a changed sex from male to female. DPHHS's agency action is the cause of that complaint, not MVD's agency action.

¶91 The Plaintiffs were so eager to obtain a preliminary injunction that they skipped the customary phase in civil litigation called discovery. Had they actually engaged in discovery, they may have learned whether MVD has a policy and what it is. The District Court and now this Court suffer from the same haste and have issued and upheld a preliminary injunction without learning what exactly they are enjoining. It's as if they are saying, "MVD, we don't know what you are doing, but whatever it is, we assume it is bad and you need to stop."

¶92 Doe has therefore failed to prove MVD is the cause of the complained-of injury and has failed to prove the court can redress that injury. For all we know, MVD has a policy that says Doe and any other citizen can walk in and obtain a driver's license that omits listing their sex as Male and instead lists their gender as Female, or some other accommodation for transgender Montanans. Unlikely? Yes. Disproven? No. We simply don't know what MVD is doing, because there is no record in this case of anyone asking MVD since September 28, 2023, nearly five months before DPHHS adopted its new administrative rule. So, if we don't know the MVD policy, the Plaintiffs cannot possibly meet their burden to prove that policy injured Doe or that the court can alleviate that injury. If the Plaintiffs cannot meet the burden of proving standing, then *a fortiori* they cannot demonstrate likelihood of success on the merits, likelihood of suffering irreparable harm, balance of equities in their favor, and the order is in the public interest. Section 27-19-201(1), MCA; *Mercer v. Mont. Dep't of Pub. Health and Human Servs.*,

2025 MT 9, ¶ 13, 420 Mont. 201, 562 P.3d 502.  At a minimum, the Court should order MVD as a Defendant dismissed without prejudice (Plaintiffs can refile after learning MVD's policy, if necessary) and vacate the preliminary injunction as to MVD.

**The Plaintiffs Request Judicial Legislation to Amend Statutory Definitions**

¶93  At the bottom of their argument, the Plaintiffs simply believe the Legislature incorrectly defined "sex" by omitting "gender" from the definition.  They ask the courts to enjoin statutes to which they object and impliedly rewrite statutes and rules to their liking.  We err in accepting this invitation because it eviscerates the Legislature's policy-making authority and abuses the judicial authority to decide cases.

¶94  We begin with an overlooked fact and argument relevant to the birth certificates in this case.  It is undisputed the two birth certificates are the most reasonably accurate record of a historic event—the birth of a human being—based upon the most commonly-used methodology of determining whether a newborn baby is a boy or a girl.  It's the same methodology humans have been using since we lived in caves or simple mud huts: the appearance of the baby's genitalia.

¶95  The Plaintiffs do not argue that either Kalarchik or Doe received an incorrect certificate of birth when the documents were originally created.  "Appellees are not challenging the original recording of what sex someone was identified as at birth but rather the restriction on who may obtain an *amended* birth certificate."  (Emphasis in original.)  Indeed, their expert witness concedes the old-fashioned method of discerning an infant's sex at birth is accurate for most of the population:

60

At birth, infants are assigned a sex, typically male or female, based solely on the appearance of their external genitalia. For most people, that assignment turns out to be accurate, and their birth-assigned sex matches that person's actual sex. . . . External genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex.

¶96    The State's expert agrees with the reliability of this indication in most cases:

A person's sex only refers to the type of gamete [sperm or ova] an individual has the biological function to produce. There is no other way to be male or female besides this. . . . External genitalia is accurate in predicting a person's biological sex over 99.98% of the time. (Sax 2002). This is because morphology of a person's external genitalia is a downstream developmental consequence of their biological sex.

¶97    Applying those definitions to this case, we have two Plaintiffs, neither of which has challenged the act of recording their biological sex as male at the time of their birth. The historical record of their birth—the entire purpose of a birth certificate—was accurate at the time based upon the most commonly used information at the time. Neither Plaintiff has raised the argument that their gametes (sperm) are in conflict with the presence of their genitalia. If there was a gamete-genitalia conflict, then even according to the State's expert witness there would be a viable argument the biological sex designation on the birth certificate was incorrect. That merit-based conflict could also give rise to an as-applied constitutional challenge. But again, the Plaintiff-Appellees don't make that argument.

¶98    Without that factual conflict, we are left with the collision of the Plaintiffs' theory of gender and sex versus the Legislature's definition of sex. The Plaintiffs allege their experience of gender identity is part of their definition of biological sex. That's fine for their own experience, so far as it goes. But the popularly-elected Legislature has

61

determined that gender identity expression is irrelevant to the definition of biological sex. It has provided the following relevant definitions:

> (a) "Female" means a member of the human species who, under normal development, has XX chromosomes and produces or would produce relatively large, relatively immobile gametes, or eggs, during her life cycle and has a reproductive and endocrine system oriented around the production of those gametes. An individual who would otherwise fall within this definition, but for a biological or genetic condition, is female.

> (b) "Male" means a member of the human species who, under normal development, has XY chromosomes and produces or would produce small, mobile gametes, or sperm, during his life cycle and has a reproductive and endocrine system oriented around the production of those gametes. An individual who would otherwise fall within this definition, but for a biological or genetic condition, is male.

> .   .   .

> (f) "Sex" means the organization of the body parts and gametes for reproduction in human beings and other organisms. In human beings, there are exactly two sexes, male and female, with two corresponding types of gametes. The sexes are determined by the biological and genetic indication of male or female, including sex chromosomes, naturally occurring sex chromosomes, gonads, and nonambiguous internal and external genitalia present at birth, without regard to an individual's psychological, behavioral, social, chosen, or subjective experience of gender.

Section 1-1-201(1)(a), (b), (f), MCA.

¶99 The Plaintiffs simply disagree with the Legislature's authority to define sex, male, and female as they have done above. Fair enough. Yet they don't challenge the initial at-birth designation of their sex as male, so they have accepted the definitions to the extent necessary to create their own original birth certificates. They therefore demand this lawsuit produce two levels of policy-making changes. First, the Court should reject the Legislature's definition and replace it with their expert's definition:

A person's sex is comprised of a number of components including, inter alia, chromosomal composition (detectible through karyotyping); gonads and internal reproductive organs (detectible by ultrasound, and occasionally by a physical pelvic exam); external genitalia (which are visible at birth); sexual differentiations in brain development and structure (detectible by functional magnetic resonance imaging studies and autopsy); and gender identity.

¶100 Second, they demand DPHHS allow them to change the sex designation on their birth certificate to reflect how they *now* identify and retroactively apply that change to their date of birth, even though they effectively concede the certificate's accuracy on their date of birth. They also reserve the right to subsequently change their birth certificate to a different gender in the future, without a limiting principle as to their exercise of this so-called fundamental right. It does not stretch the imagination to understand why the Legislature declined to codify this scheme.

¶101 The logic of Plaintiffs' argument is further undermined by their caveat that the State may retain their original birth certificates, after it is amended. "Appellees have no objection to Appellants retaining their original birth certificates for Appellants to examine for other legitimate State interests." This argument is contrary to the statute and administrative rules for court-ordered changes of birth certificates. "If the order directs the issuance of a new birth certificate that does not show amendments, the new birth certificate may not indicate on its face that it was amended." Section 50-15-224(3), MCA. When issuing amended birth certificates in cases of paternity, adoption, or legitimization, "The department will replace the original birth certificate with a new one . . . ." Admin. R. M. § 37.8.311(1) (2022), and "If the court order directs the issuance of a new certificate, the record will not show amendments, and the new certificate will not indicate on its face that

it was amended." Admin. R. M. § 37.8.311(4) (2022) (applying to adoption, paternity confirmation, and name changes). To facilitate replacement birth certificates for adoptions, "the registrar must send all original birth documents to the department within 30 days." Admin. R. M. § 37.8.310(2) (2002). The Legislature and DPHHS have consistently determined that a replacement birth certificate is just that. The original should be removed, and the replacement should not indicate on its face it is amended. Somehow the Majority believes this further judicial rewriting of the statute and the Administrative Rules of Montana is a feature, not a bug, of the Plaintiffs' arguments. I don't see it that way, and apparently the Legislative and Executive Branches don't, either. It leads to further confusion and frustrates accuracy in the State's record-keeping.

¶102 So, this boils down to a simple question: what authority does the Legislature have to define sex, male, and female, and what authority does the Legislature have to establish and regulate a scheme of vital records and accurate identification documents? The State has correctly argued, in my view, that establishing definitions and creating an orderly scheme of record-keeping is subject to rational basis review. The purpose of the legislation is to enact a uniform and accurate system of vital records, and the definition of sex does not implicate or treat differently the members of a suspect class. *See Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 17, 353 Mont. 265, 222 P.3d 566 (applying rational basis review because the statute does not infringe the rights of a suspect class or involve a fundamental right with origins in the Montana Constitution); *Henry v. State Compensation Ins. Fund*, 1999 MT 126, ¶¶ 29–30, 294 Mont. 449, 982 P.2d 456 (same).

64

¶103   I sympathize with the Plaintiffs and with Justice Baker's desire to make room in our society for any competent adult to express their identity in a manner that comports with their own sense of self and their innate personal dignity.[2]   The Legislature and the Executive agencies could write statutes and driver's license policies to accommodate the Plaintiff-Appellees' wishes, but the Constitution does not *compel* them to do so.   The Majority ignores not only the State's interest in maintaining accurate historical records and identification documents linked to the correctly-recorded biological sex of the Plaintiffs but also abuses our judicial power by striking down a statute and rule merely because they disapprove of it, not because it is "repugnant to the constitution."   *Marbury v. Madison*, 5 U.S. 137, 176, 2 L. Ed. 60, 73 (1803).

¶104   As Justice Rice correctly notes in his Dissent, the Court has now mandated the DPHHS produce birth certificates that are inaccurate and are a proxy for a new form of document called a Gender Identity Certificate.   Dissent, ¶ 70.   The Legislature didn't do that, the Court did.   But based on what power?

**Learning From Our Mistakes**

¶105   Why do I insist upon being such a reactionary?   Perhaps it's because I want the Court to learn the lessons of its own recent history and strive to build more confidence in

---

[2] We have not established a clear approach to analyzing the dignity clause in Article II, Section 4, of the Montana Constitution.   "But what exactly is 'dignity'?   It would be impractical here to attempt to provide an exhaustive definition.   Rather, the meaning of this term must be fleshed out on a case-by-case basis."   *Baxter v. State*, 2009 MT 449, ¶ 84, 354 Mont. 234, 224 P.3d 1211 (Nelson, J., concurring).   The clause was first enacted in the 1949 West Germany Constitution in response to Nazi atrocities during World War II, then included in the 1951 Puerto Rico Conistitution before being adopted by Montana's 1972 Constitution.   Its origins and meaning bear much closer scrutiny and scholarship.   *Baxter*, ¶ 116 n.4 (Rice, J., dissenting).

this system of justice. The ink is barely dry on *State v. Cole*, 2026 MT 52, 427 Mont. 64, ___ P.3d ___, wherein we overruled a case issued less than two years ago, *State v. Gibbons*, 2024 MT 63, 416 Mont. 1, 545 P.3d 686. We did so because we recognized *Gibbons* was manifestly wrong. The *Gibbons* Court bypassed a statutory interpretation solution and created a brand-new constitutional holding which conflicted with every other court in the United States, rewrote statute, overruled multiple prior opinions of this Court, and injected uncertainty into the law. *Cole*, ¶ 20; *State v. Vaska*, 2025 MT 168, ¶¶ 33-93, 423 Mont. 194, 573 P.3d 327 (Swanson, C.J., dissenting). This was done by means of a 4-3 majority.

¶106 The Court appears to be engaged in the same errant exercise today. In doing so, they have failed to learn the *Gibbons-Vaska-Cole* lesson, which is to avoid establishing new or novel constitutional holdings based upon spurious reasoning and supported by a bare majority of the Court. Such Court opinions will not endure, nor should they. The Court will have to take a future opportunity, hopefully on a more complete district court record and with parties who have standing on all of their claims, to clean up this mess and discern the right constitutional holding.

¶107 Between that day and this, we must suffer the consequences of today's judicial misadventure. And we would be naïve to ignore how serious it is. First, the Court has cast aside the judicial restraint and sound reasoning of prior cases where we declined to hold sex-based discrimination is subject to strict scrutiny. *Cross v. State*, 2024 MT 303, ¶ 61, 419 Mont. 290, 560 P.3d 637 (McKinnon, J., concurring). Then the Majority has hastily equated gender identity discrimination with sex discrimination, which the Dissent has correctly criticized. Dissent, ¶ 67. Finally, the Court has erred in affirming an erroneous

injunction to prevent MVD from enforcing a driver's license policy that may or may not exist, and to compel DPHHS to create false historical records when even the Plaintiffs agree they were accurate at the time of creation.

¶108   If we enjoin the State from enforcing its law, what do we instruct the State to do? Apparently, we must somehow supply a judicially-created law in its place.  Our job is to interpret the laws, not write them.  The Majority's activism supercharges the policy debate by placing the courts as the central actor in the daily political dispute.  This cavalier approach to statutory construction contradicts our avowed role by saying what the law *should be*, rather than what the law *is*.  *Marbury*, 5 U.S. at 177, 2 L. Ed. at 74 ("It is emphatically the province and duty of the judicial department to say what the law is.").

¶109   I suggest a more measured approach.  When a court encounters a lawsuit involving a lively and evolving public debate over policy issues, the best course of action is to rule as narrowly as possible, so as to resolve the justiciable issue before it but leave room for the public discourse.  Courts must resist the temptation to issue the first word, particularly on constitutional grounds, when a narrower decision is available.  We have been "guided by the judicial principle that we should decline to rule on the constitutionality of a legislative act if we are able to decide the case without reaching constitutional questions." *Baxter*, ¶ 10.  On matters of policy, the people should lead the courts, not the other way around, to better establish broad acceptance of the collective logic.  As Abraham Lincoln said, "With public sentiment, nothing can fail; without it nothing can succeed.

Consequently, he who moulds public sentiment, goes deeper than he who enacts statutes or pronounces decisions."[3]

¶110 If the question is complex and newly-emerging as this one is, our duty is to tread carefully and require a fully-developed record with sound bases for ruling. When a law is susceptible to multiple interpretations, we must interpret it in a manner that is constitutional if possible. *Brown v. Gianforte*, 2021 MT 149, ¶ 32, 404 Mont. 269, 488 P.3d 548; *Montanans for Responsible Use of Sch. Tr. v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶ 11, 296 Mont. 402, 989 P.2d 800; *State v. Nye*, 283 Mont. 505, 510, 943 P.2d 96, 99 (1997). Finally, when addressing an issue on preliminary injunction, we should avoid forecasting or deciding the matter on the merits. *Planned Parenthood of Montana v. State*, 2024 MT 228, ¶ 57, 418 Mont. 253, 557 P.3d 440 (Baker, J., concurring). The Majority today has blown through all of these prudential instructions to issue a political decision dressed up in constitutional garb.

¶111 One can easily foresee a future legislatively-enacted law by which transgender persons receive an accommodation to obtain an identity card matching their current gender expression without requiring the State to change that person's accurate historical record of their birth. But now that we have spoken from the judicial mountaintop, where is the incentive toward continued public debate, mutual respect, and accommodation? Each side is in fact incentivized to stake out maximalist positions and then rush to the courthouse so the least democratic branch can settle political disputes better left to the policy-makers.

---

[3] *First-Lincoln Douglas Debate at Ottawa, Ill., August 21, 1858 in The Complete Lincoln-Douglas Debates of 1858*, 128 (Paul M. Angle ed. University of Chicago Press, 1994).

The more activist the court, the more its uncured decisions fuel the misunderstanding of the judiciary's role and undermine the moral heft of its reason.  In such an environment, it may be more politically rewarding for some parties to lose these cases loudly and spectacularly, rather than win.  The Majority's sweeping and manifestly wrong decision based upon undeveloped constitutional logic and expressed policy preferences has produced more grist for the political mill.

¶112   There's an old saying in marksmanship: aim small, miss small.  The Court today has aimed big and missed by a mile.

/S/ CORY J. SWANSON